RECEIVED
IN ALEXANDRIA, LA

SEP 3 0 2010

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


HARDIN IZELL COOPER,            CIVIL ACTION
      Plaintiff                 SECTION "P"
                                NO. 1:09-CV-00967
VERSUS

FEDERAL BUREAU OF PRISONS,      JUDGE DEE D. DRELL
et al.,                         MAGISTRATE JUDGE JAMES D. KIRK
      Defendants


<u>REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE</u>

Before this court is a complaint filed in forma pauperis pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999 (1971),[1] on January 14, 2009[2] and amended on June 9, 2009 (Doc. 5) and January 4, 2010 (Doc. 13), by plaintiff Hardin Izell Cooper ("Cooper"). The defendants are the United States Bureau of Prisons ("BOP"), Joe

---

[1] <u>Bivens</u> defendants are federal officials brought into federal court for violating the Federal Constitution. <u>Bivens</u>-type actions may be brought only against federal agents and not federal agencies. <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 486, 114 S.Ct. 996, 1006, 127 L.Ed.2d 308 (1994); <u>Whitley v. Hunt</u>, 158 F.3d 882 885 (5th Cir. 1998). Under <u>Bivens</u>, a plaintiff may recover damages for any injuries suffered as a result of federal agents' violations of his constitutional rights. <u>Channer v. Hall</u>, 112 F.3d 214, 216 (5th Cir. 1997).

[2] Cooper's complaint was originally filed in the District of Columbia and was transferred to this court on June 12, 2009 (Doc. 4).

Keffer (Warden of the United States Penitentiary in Pollock, Louisiana), and Anthony Garrow (an investigative officer formerly employed at USP-Pollock), Ricardo Marques, Jr. (a corrections officer/captain employed at USP-Pollock), Kenneth Montgomery (a corrections officer/unit manager employed at USP-Pollock), Crystal Zerr (a case manager employed at USP-Pollock), and Vassil Apostolov, Dr. Melissa Hughes-Albert, and Dr. Sandra Lang.

Cooper alleges that he is suing the defendants in both their individual and official capacities, and further alleges he has exhausted his administrative remedies (Doc. 1). Cooper contends that, while he was incarcerated in USP-Pollock on June 13, 2008, he suffered life threatening stab wounds from an assault by other inmates (Doc. 1). As a result of his injuries, Cooper underwent two surgeries to repair his small bowel and abdomen and to repair the nerve damage to his right forearm and restore function to his right hand (Doc. 1). Cooper contends the he is still unable to normally hold, grab, or lift anything that requires him to open his right hand wide and extend the five fingers, he cannot lift, move a certain way, or engage in any rigorous activity, he has chronic abdominal pain, and he has bouts of nausea and regurgitation (Doc. 1). Cooper admits he receives pain medication, pills for stomach complications, and stool softener, has a medical work restriction, and has a lower bunk pass (Doc. 1).

Cooper alleges defendants were deliberately indifferent to his

safety, despite actual knowledge of the risk of harm posed by Cooper's attacker.  Cooper alleges that Warden Keffer, Garrow, and Marques failed to implement adequate weapon control policies. Cooper further alleges that Garrow, Marques, Montgomery and Zerr carried out the policies or customs that did not insure the safety of inmates from attacks by other inmates, which resulted in his injuries.  According to Cooper, the unconstitutional policies also relate to inadequate prisoner classification and failure to segregate, control, or properly discipline dangerous inmates. Cooper contends his attacker had committed at least two prior assaults with a knife on inmates and had been sanctioned for making weapons for inmates.  Also, metal detectors were not installed in the housing units or outside recreation yard of the high security prison until August 2008, over seven years after it opened, due to federal budget problems, and the facility only recently implemented random body searches and housing unit searches.  Cooper also alleges he was denied adequate mental health care by defendants Hughes-Albert, Lang, and Apostolov.

For relief, Cooper asks for a jury trial, monetary damages (including punitive), costs, and attorney fees.

Defendants filed a motion for summary judgment with supporting evidence (Doc. 14).[3]  Cooper filed an opposition to defendants'

---

[3] The record before this court does not indicate that this suit was ever served on defendants or that an answer to the complaints was ever filed.  However, defendants have submitted to

motion (Doc. 23),[4] to which defendants responded (Doc. 26).
Defendants Vassil Apostolov, Dr. Melissa Hughes-Albert, and Dr.
Sandra Lang, and Cooper's denial of medical care claims, were then
voluntarily dismissed by plaintiff (Docs. 27, 29).  The motion for
summary judgment by the remaining defendants, the BOP, Garrow,
Keffer, Marques, Montgomery, and Zerr, is now before the court for
disposition.

<u>Law and Analysis</u>

<u>The Law of Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure mandates that
a summary judgment:

> "shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, [submitted
> concerning the motion for summary judgment], if any, show
> that there is no genuine issue as to any material fact
> and that the moving party is entitled to judgment as a
> matter of law."

Paragraph (e) of Rule 56 also provides the following:

> "When a motion for summary judgment is made and supported
> as provided in this rule, an adverse party may not rest
> upon the mere allegations or denials of the adverse
> party's pleading, but the adverse party's response, by
> affidavits or as otherwise provided in this rule, must

---

the jurisdiction of this court through their motion for summary
judgment.

[4] Cooper's attorney included his own affidavit with the
response to defendants' motion for summary judgment (Doc. 23).
Since it is clear that Cooper's attorney's affidavit is nothing
more than argument and that his attorney does not have any
personal knowledge of any facts relating to the incident or to
USP-Pollock, that affidavit will not be considered.

set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material".  A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff.  Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial.  In this analysis, we review the facts and draw all inferences most favorable to the nonmovant.  Herrera v. Millsap,

862 F.2d 1157, 1159 (5th Cir. 1989). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment. Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82(1992).

Bureau of Prisons and Official Capacity Action

Cooper sued the Bureau of Prisons. Cooper also sued defendants in their official capacities as well as their individual capacities. Bivens defendants are federal officials brought into federal court for violating the Federal Constitution. Bivens-type actions may be brought only against federal agents and not federal agencies. Martinez v. City of Los Angeles, 141 F.3d 1373, 1383 (9th Cir. 1998). Also, F.D.I.C. v. Meyer, 510 U.S. 471, 486, 114 S.Ct. 996, 1006, 127 L.Ed.2d 308 (1994); Whitley v. Hunt, 158 F.3d 882 885 (5th Cir. 1998). An inmate may not bring a Bivens action against the United States, the Bureau of Prisons, or its officers in their official capacities as such claims are barred by the doctrine of sovereign immunity. Gibson v. Federal Bureau of Prisons, 121 Fed.Appx. 549, 551 (5th Cir. 2004), citing Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991)(the real party in interest in an official-capacity suit is the governmental entity and not the names official); Correctional Serv. Corp. v. Malesko, 534 U.S. 61, 122 S.Ct. 515 (2001).

Therefore, defendants' motion for summary judgment should be

granted as to Cooper's claims against the Bureau of Prisons and the defendants in their official capacities.

Qualified Immunity

Defendants raise the affirmative defense of exhaustion for the first time in a motion for summary judgment.   An affirmative defense may be raised on a motion for summary judgment only if that motion is the first pleading responsive to the substance of the allegations. U.S. v. Burzynski Cancer Research Institute, 819 F.2d 1301, 1307 (5th Cir. 1987), cert. den., 484 U.S. 1065, 108 S.Ct. 1026 (1988).  Also, Kerr v. Bluebonnet Sav. Bank, FSB, 39 F.3d 320 (5th Cir. 1994).  Since defendants' motion for summary judgment is their first responsive pleading, their qualified immunity defense is properly before this court.

Defendants claim the defense of qualified immunity.   The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the official violated a constitutional right that was clearly established at the time of the incident. Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995), cert. den., 516 U.S. 1084, 116 S.Ct. 800 (1996).  Qualified immunity cloaks a police officer from personal liability for discretionary acts which do not violate well established law. Officers have qualified immunity if their actions could reasonably have been thought consistent with the right they are alleged to have violated. Richardson v. Oldham, 12 F.3d 1373, 1380-81 (5th

7

Cir. 1994), and cases cited therein.  Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.  _Hope v. Pelzer_,  536 U.S. 730, 122 S.Ct. 2508, 2515 (2002).

Invocation of the qualified immunity defense shifts the burdens of proof in federal civil rights lawsuits brought against public officials for actions or omissions attending their performance of official duties:

> "The defendant official must initially plead his good
> faith and establish that he was acting within the scope
> of his discretionary authority. Once the defendant has
> done so, the burden shifts to the plaintiff to rebut this
> defense by establishing that the official's allegedly
> wrongful conduct violated clearly established law."

_Bazan v. Hidalgo County_, 246 F.3d 481, 489 (5th Cir. 2001), citing _Salas v. Carpenter_, 980 F.2d 299, 306 (5th Cir. 1992).

The bifurcated test for qualified immunity is: (1) whether the plaintiff has alleged a violation of a clearly established constitutional rights; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident.  _Hare v. City of Corinth_, 135 F.3d 320, 325 (5th Cir. 1998), and cases cited therein.

The first step is to determine whether the plaintiff has alleged violation of a clearly established constitutional right. This analysis is made under the currently applicable constitutional standards.  _Hare_, 135 F.3d at 325.  A constitutional right is clearly established if, in light of pre-existing law, the

8

unlawfulness is apparent.  Officials must observe general, well-developed legal principles.  <u>Doe v. Taylor Independent School Dist.</u>, 15 F.3d 443, 445 (5th Cir.), cert. den., 513 U.S. 815, 115 S.Ct. 70 (1994).  In the case at bar, Cooper alleges that, in 2008, defendants failed to protect him from attacks by inmates who were known to the defendants to be violent.  The Eighth Amendment duty of prison officials to protect prisoners from violence at the hands of other prisoners was explained at length by the Supreme Court in the 1994 case of <u>Farmer v. Brennan</u>, 511 U.S. 825, 114 S.Ct. 1970, 1977 (1994).  Therefore, Cooper has alleged the violation of his clearly established constitutional right to be protected by prison officials from attacks by other inmates.

The second prong of the qualified immunity test is better understood as two separate inquiries: (1) whether the allegedly violated constitutional rights were clearly established at the time of the incident and, if so, (2) whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law.  <u>Hare</u>, 135 F.3d at 325-36.  Since Cooper alleges the violation of his Eight Amendment right to safety in prison, a right which was clearly established in 2008, he has satisfied the first part of this test.

The second part, objective reasonableness is a question of law for the court.  The court must determine whether the conduct of the individual defendants was objectively reasonable in the light of

9

the then clearly established law.  <u>Hare</u>, 135 F.3d at 327.  The analysis for objective reasonableness is different from that for deliberate indifference (the subjective test for addressing the merits).  For qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident and, under that minimum standard, the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable.  <u>Hare</u>, 135 F.3d at 328.  The qualified immunity doctrine does not protect an official whose subjective intent was to harm the plaintiff, regardless of the objective state of the law at the time of his conduct.  <u>Douthit v. Jones</u>, 619 F.2d 527, 533 (5th Cir. 1980).

Therefore, a party seeking to avoid a qualified immunity defense must prove that the official either actually intended to do harm to him, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result.  <u>Douthit</u>, 619 F.2d at 533.

Cooper's failure to protect claim is discussed below.

<u>Failure to Protect</u>

For an inmate to succeed on a claim based on a failure to prevent harm, he must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) the

prison official was "deliberately indifferent" to his health or safety. Failing to act with deliberate indifference to a substantial risk of harm is the equivalent of recklessly disregarding that risk. Farmer, 114 S.Ct. at 1978. Deliberate indifference is a subjective test and it must be shown that the official actually knew of the risk of harm to the inmate. It is insufficient to show solely that the official should have known of the risk. The official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference. Farmer, 114 S.Ct. at 1979.

Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. A fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. It remains open to an official to prove that he was unaware of even an obvious risk to inmate health and safety. Farmer, 114 S.Ct. at 1981-82. Also, Hinojosa v. Johnson, 277 Fed.Appx. 370, 374 (5th Cir. 2008). However, a prison official who actually knew of a substantial risk to inmate health and safety may be found free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted. Farmer, 114 S.Ct. at 1982-83.

The failure of a prisoner to give any advance notice to prison

11

officials of potential danger to the prisoner's safety is not dispositive of the issue of the official's awareness, nor is advance notice of a substantial risk of assault posed by a particular fellow prisoner a prerequisite.  <u>Farmer</u>, 114 S.Ct. at 1984-1985.

<u>Cooper's Allegations</u>

Cooper must show he was incarcerated under conditions which subjected him to a substantial risk of harm and that defendants knew of the risk of harm to Cooper.

Cooper states in his affidavit (Doc. 23) that he and Jeffs were both confined in the C-2 housing unit and that, on June 13, 2008 at about 7:50 p.m., as he was exiting his cell on the upper tier of the C-2 unit, he was assaulted with and severely injured by a sharpened metal shank wielded by Jeffs.  Cooper states that he was 5'4" tall and weighed 135 pounds, while Jeffs was 6'2" tall and weighed about 200 pounds (Doc. 23).  Cooper states he had been at USP-Pollock about six weeks when the attack occurred (Doc. 23). Cooper states that, although Garrow described the attack as a "fight," it was actually an unprovoked attack which was videotaped (Doc. 23).  Cooper states he sustained a deep wound to his abdomen and required emergency surgery to repair his bowel, a deep laceration to his upper right arm which required orthopedic surgery for repair of his radial nerve, an abrasion to the right rib cage area, and a cut on the left side of his nose (Doc. 23).

Cooper states Jeffs had a history of assaults because he had previously attacked at least two inmates with metal shanks and caused severe injuries (Doc. 23).   Defendants states in the statement of undisputed facts that Jeffs did not have any prior incidents of assaulting inmates with a dangerous weapon (Doc. 14). Cooper also states that Marques admitted to him, while Cooper was in the hospital, that Jeffs was known for "making and selling shanks" to other inmates (Doc. 23).  Jeffs was found in possession of two metal shanks on June 4, 2008 as well as locker doors with which to make more weapons (Doc. 23).  Marques states in his affidavit (Doc. 14) that he does not recall visiting Cooper although he customarily visited inmates who were in the hospital, and that Jeffs was known to him as a weapons-maker.  Cooper's unsupported allegations do not prove that defendants should have known Cooper was at risk from an attack by Jeffs.

Cooper also alleges that, although USP-Pollock is classified as a "high security" prison, there were no metal detectors in the housing units until 2008, sometime after Todd P. Jeffs' June 13, 2008 assault on Cooper, when they were installed in the housing units in an attempt to control the occurrence of inmate assaults. Cooper also alleges that, even were there were metal detectors, they were often unmanned by an officer or, sometimes, the officers ignored them when inmates failed to clear them.  Cooper states in his affidavit that defendants did not install metal detectors in

the housing units' entrances or in the recreation yard, which is
not consistent with the practices in other "high security" BOP
facilities (Doc. 23). Cooper states in his affidavit that Jeffs'
shank was made of metal (Doc. 23), but defendants have not admitted
that and state in their affidavits (Doc. 14) that metal detectors
do not detect weapons made of non-metal substances. The court
takes judicial notice of the fact that Jeffs was indicted on
February 25, 2009 for assaulting another inmate with a dangerous
weapon-an eight inch homemade steel shank-on June 13, 2008 with
intent to bodily harm. Jeffs pleaded guilty to the charge and is
currently awaiting sentencing United States Court for the Western
District of Louisiana. USA v. Jeffs, 1:09-cr-00032. Therefore,
pursuant to Jeffs' charge and guilty plea, the court finds there is
no issue as to the fact that Jeffs attacked Cooper with a metal
shank. Defendants show in their affidavits, discussed below, that
budget constraints limited the number of walk-through metal
detectors in use at USP-Pollock, but the staff had hand-held metal
detectors and several other weapons-control measures were
implemented as well, to find weapons made of other materials as
well as metal weapons. Although Cooper states that many of the
weapons-controls measures were not implemented prior to 2008, he
does not allege or show which, if any, measures were not
implemented prior to the June 13, 2008 attack on him (other than
lack of metal detectors in the housing units) and whether, had they

14

been implemented sooner, they would have made any difference to his case.  This issue is discussed further below.

Cooper also states in his affidavit that there was an inmate assault with a metal shank (by inmate Robert Oviedo) on the day before Cooper was assaulted, just two floors above plaintiff's in the C Unit housing unit, but there were no searches conducted and the inmates were not placed on lockdown (Doc. 23).  Cooper argues that, had the C-2 housing unit been placed on lockdown, Jeffs could not have attacked him.  However, defendant Anthony Garrow shows in his supplemental affidavit (Doc. 26) that the assault that took place on June 12, 2008 took place in Unit A-3, which is located on the opposite side of the prison compound, about 200 yards away, from Unit C-2, where Cooper's assault took place on June 13, 2008. Garrow further shows in his affidavit that, due to new, enhanced security measures for controlled inmate movements and segregated confinement at USP-Pollock in 2008, inmates from Unit A-3 and Unit C-2 were kept isolated from one another virtually all of the time (Doc. 26).  Garrow shows the June 12, 2008 assault was an incident between two inmates involved with the same gang, involving internal gang issues, and did not appear to be indicative of a wide-spread problem that could impact the security of other housing units, so an institution-wide lockdown (which would include a lockdown of C-2) was not warranted, nor was a search of Unit C-2 warranted (Doc. 26).  Therefore, Cooper's claim that the C-2 housing unit should

have been on lock down on June 13, 2008 due to the June 12, 2008 assault is meritless.

Cooper alleges there was a pattern of assaults on new inmates at USP-Pollock, which was why he was assaulted.  However, Garrow states in his supplemental affidavit (Doc. 26) that the three prior homicides pointed out by Cooper, involving victims Tyrone Johnson, Donald Till, and William Bullock, did not establish a pattern of homicides of new inmates.  Garrow states that Till's death was labeled a suicide by the coroner (Doc. 26).  Garrow states that Johnson initiated an assault on another inmate, then carried the assault to a second inmate who ended up killing Johnson (Doc. 26).  Finally, Garrow states that Bullock was a new inmate, but his death was believed to be the result of internal group issues between Bullock and his assailant, and not because he was a new inmate (Doc. 26).  Therefore, Cooper's claim that there was a pattern of attacks on new inmates at USP-Pollock is unsupported.

Cooper also states in his affidavit that Jeffs was found with an arsenal of metal weapons and materials to make weapons just eight days before he assaulted Cooper-a 6" flat metal shank, a 12" rebar shank, and locker doors to be used as weapon-making material, but a disciplinary hearing had not been held on Jeffs despite BOP policy to do so within 72 hours and elected not to charged Jeffs with "greatest category" offenses (Doc. 23); also, no hearing had been held on Jeffs' prior offense of possessing a metal shank on

January 18, 2008.  Cooper states that a hearing was held on all of Jeffs' 2008 offenses on June 23, 2008, ten days after Jeffs' June 13 assault on Cooper (Doc. 23).

Defendants have not refuted Cooper's allegations concerning Jeffs' possession of locker doors as stock material with which to make weapons, although Marques denies in his affidavit that Jeffs was known to be a weapons maker.  BOP policy, in Program Statement 5270.07,[5] states "Code 104 - Possession, manufacture, or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, or any ammunition" is a "greatest category offense."  Keffer,[6] Marques,[7] and Garrow[8] admit in their affidavits that Jeffs had previous disciplinary charges

---

[5] BOP policies are available at the BOP website at http://www.bop.gov.

[6] In his affidavit (Doc. 14-5), Warden Keffer stated, "11. Specifically, I understand inmate Jeffs, prior to the June 13, 2008 assault, received three incident reports for possession of a weapon, one prior incident report for fighting with another nimates and one incident report for assault.  None of these incidents concerned Plaintiff."

[7] In his affidavit (Doc. 14-6), Marques states, "16. A review of Jeffs' prior disciplinary hisoty indicates that, although he was involved in a few fights and separate possession of weapons, he was not involved in a serious assault on an inmate with the use of a weapon."

[8] Garrow states in his affidavit (Doc. 14-7) that, "21. A review of inmates Jeffs' disciplinary history at USP Pollock reveals that, since his arrival to USP Pollock on November 21, 2006, up until the June 13, 2008 assault, Jeffs received three incident reports for possessing weapons and two incident reports for fighting."

for possession of weapons.  None of the defendants address Cooper's allegation that, had Jeffs been placed in segregation following the discovery of his weapons on June 5, 2008[9] and pending the investigation, or had Jeffs' disciplinary hearing been held within three days of June 5, 2008 as required by Program Statement 5270.07, Jeffs would have been in lockdown on June 13, 2008 and would not have been able to attack Cooper.  However, Cooper's argument obviously assumes Jeffs would not have attacked him on a different date.  Moreover, the Unit Disciplinary Committee would have had to refer Jeffs to the Disciplinary Hearing Officer, since he was charged with a greatest category offense; there is no time limit for the hearing before the Disciplinary Hearing Officer.  See Program Statement 5270.07.  After referral to the Disciplinary Hearing Officer, the Unit Disciplinary Committee had the option to retain Jeffs in administrative detention or other restricted status, pursuant to Program Statement 5270.07, but it was not mandatory that they do so.  Therefore, even had the Unit Disciplinary Committee timely convened for Jeffs' case after his June 4, 2008 offense, the case would have been referred to the Disciplinary Hearing Officer and Jeffs would not necessarily have been held in segregation pending that hearing.

Therefore, Cooper's argument that he would not have been

---

[9] The court assumes June 5, 2008 is the correct date based on Cooper's allegation that the incident took place eight days before Jeffs' June 13, 2008 attack on Cooper.

attacked and injured had defendants held Jeffs' hearing timely is meritless.

Cooper also claims defendants failed to refer Jeffs for prosecution.  However, Jeffs was referred to prosecution; he was charged with and pleaded guilty to assault on an inmate with a dangerous weapon-an eight inch homemade metal shank-with intent to do bodily harm and without just cause or excuse, pursuant to 18 U.S.C. § 113(a)(3).   USA v. Jeffs, 1:09-cr-00032.   Therefore, Cooper's allegation is erroneous and meritless.

Cooper states in his affidavit that unnamed persons at USP-Pollock have been intentionally under-reporting the severity of assaults by failing to include the fact that the assaults involved the use of weapons or resulted in injuries, citing an assault that took place on December 28, 2008 (Doc. 23).  Since Cooper does not allege that any of the named defendants have under-reported assaults, has not shown that his assault was under-reported (it obviously was not under-reported since it was referred for prosecution), and since the assault cited by Cooper took place several months after his assault, this allegation appears to be irrelevant to Cooper's case.  This claim is meritless.

Cooper also contends USP-Pollock transferred out dangerous prisoners in 2009, but not before (Doc. 23); again, this contention is unsupported.  Marques states in his affidavit that in 2008, whenever inmates were involved in serious assaults with weapons at

USP-Pollock, one of the inmates involved was submitted by the institution for transfer consideration (Doc. 14).  Warden Keffer states in his affidavit that the BOP regional office made all decision regarding transfer of inmates (Doc. 14).  Therefore, although defendants could recommend that an inmate be transferred, they did not make the decision to transfer an inmate.  Cooper's claim is meritless.

### Warden Keffer

In his complaint, Cooper alleges Warden Keffer failed to properly protect Cooper from Jeffs' assault, failed to take sufficient disciplinary actions against inmates accused of assault or possession of weapons, failed to have sufficient metal detectors, failed to control weapons in USP-Pollock, and (as the final decisionmaker) failed to refer inmates guilty of assault with dangerous weapons to the U.S. Attorney for prosecution or confine them in the SHU (Doc. 13).

Defendants show in their statement of undisputed facts and an affidavit by Warden Joe Keffer (Doc. 14), that Jeffs attacked Cooper on June 13, 2008 in their housing unit, stabbing Cooper in the abdomen with a homemade weapon, and prison staff responded immediately to the incident and provided Cooper with immediate medical care including transport to the local hospital.  Defendants also show in their statement of undisputed facts (Doc. 14) that Jeffs was disciplined within the prison and referred for

20

prosecution, and he had a history of disruptive conduct but did not have a reputation as a notorious weapons-maker, though he had received two incident reports for possession of a weapon. Defendants show in their statement of undisputed facts and in Warden Keffer's affidavit that Jeffs was referred for prosecution for the attack on Cooper within three days of the attack, but his previous offenses did not merit prosecution (Doc. 14).

Defendants further show in their statement of undisputed facts and Warden Keffer's affidavit that they made "numerous efforts" to reduce weapons possession and general violence at USP-Pollock, including routine pat searches of inmates, random and frequent surprise cell searches, constant searches of inmate property, bodies and clothing, use of walk-through metal detectors "consistent with budget and resource constraints," and use of hand-held metal detectors and x-ray machines to locate contraband (Doc. 14).  Defendants instituted a weapons control committee in 2008, which studied the materials used by the inmates and common hiding places, and trained the staff in weapons interdiction and reduction efforts (Doc. 14).  Defendants further show that, in the two year period immediately prior to the assault on Cooper, they instituted 408 disciplinary actions against inmates for possession of weapons, assault, and fighting, and referred 172 cases to the FBI, 30 of which were prosecuted by the U.S. Attorney (Doc. 14).

Defendants further show in the statement of undisputed facts

that Montgomery and Zerr serve on the Unit Disciplinary Committees (UDCs), but that the Unit Disciplinary Committees only adjudicate low severity prison incidents and do not determine which inmates are prosecuted by the U.S. Attorney, which inmates are placed in segregation, or which inmates are transferred to another facility (Doc. 14). Defendants show the decision to transfer an inmate rests with the regional office staff and not with the individual facility. However, Warden Keffer's affidavit shows that USP-Pollock staff may submit an inmate for consideration for transfer (Doc. 14).

Keffer states he has been warden at USP-Pollock since December 9, 2007, the budget at USP-Pollock limited the number of metal detectors available and those were placed in areas receiving high inmate traffic, but the staff had hand held metal detectors available for use (Doc. 14). Keffer also states in his affidavit that he was not aware of any reason Jeffs and Cooper could not be housed together, and that Jeffs had previously been disciplined on several occasions for violating USP-Pollock rules prior to June 13, 2008, including three incidents of possession of a weapon, one incident of fighting with another inmate, and one incident of assault (Doc. 14). In an affidavit by Rick Marques, who was employed at USP-Pollock from October 2006 through February 2009 (Doc. 14), Marques states that in 2008, whenever inmates were involved in serious assaults with weapons at USP-Pollock, one of

22

the inmates involved was submitted by the institution for transfer consideration, but minor assaults were handled administratively at USP-Pollock (Doc. 14).

Marques states, and defendants show in their statement of undisputed facts, that there is no documentation showing that Jeffs was involved in a serious assault with a weapon prior to June 13, 2008 (Doc. 14). Warden Keffer states that Jeff's disciplinary history did not earn him a reputation as an unusually violent inmate in need of constant segregation or transfer, since USP-Pollock is a high security prison, and in any event BOP policy does not permit continuous and indefinite confinement of inmates in segregation (Doc. 14).[10] Rick Marques explains that policy in his affidavit, stating that, although an inmate may be housed in the SHU if he is under investigation for committing an infraction, an inmate known to have possessed weapons in the past would be housed in the SHU while the investigation was pending or as an actual sanction for being found guilty administratively; Jeffs was housed in the SHU on and off during Marques tenure at USP-Pollock, either for investigation or as a sanction (Doc. 14).[11] Anthony Garrow

---

[10] This court has seen otherwise in a recent case, No. 1:10-cv-00517, in which Jonathan S. Francisco was held in segregation at USP-Pollock, pending prosecution, since July 2008.

[11] In an affidavit by Milton White, a BOP Discipline Hearing Officer currently employed at USP-Pollock, White states that he presides over inmate disciplinary hearings (Doc. 14). White states in his affidavit that Jeffs had five incident reports prior to his assault on Cooper-one for assault, one for fighting,

states in his affidavit that Jeffs' discipline record of weapons possession and fighting is modest when compared to may other inmates and would not necessarily have placed him under additional scrutiny by the investigative staff (Doc. 14).

Warden Keffer further states in his affidavit that, typically, only high severity offense cases, such as assaults causing bodily injury, assaults on staff, inmate on inmate assaults with weapons, and homicides, were prosecuted by the U.S. Attorney in 2008, and that neither the U.S. Attorney's office nor the judiciary[12] has the resources to prosecute every crime occurring at USP-Pollock. Garrow states in his affidavit that the U.S. Attorney's Office and the BOP established guidelines that governed inmate prosecutions and, in 2008, generally severe incidents such as homicides and severe assaults with bodily injury were accepted for prosecution, and all others were dealt with administratively by the BOP (Doc. 14).

Cooper has not shown what Warden Keffer was deliberately

---

and three for possession of weapons-for which he was disciplined with loss of good conduct time, time in the SHU, loss of commissary privileges, and loss of visitation (Doc. 14). White further states in his affidavit that, for the June 13, 2008 assault on Cooper, Jeffs lost forty days of good conduct time, spent sixty days in disciplinary segregation, and forfeited 108 days of non-vested good conduct time (Doc. 14). White also shows in his affidavit that Cooper had been sanctioned for three "greatest severity" violations-once for refusing to take a drug test and twice for possessing weapons (Doc. 14).

[12] The court finds Warden Keffer does not have the knowledge or expertise to make such a statement regarding the judiciary.

indifferent to his safety.  Warden Keffer was also new to USP-Pollock; the attack on Cooper took place seven months after Warden Keffer arrived there.  Warden Keffer apparently had made an effort to control the violence at the prison by instituting new policies related to weapons control and inmate movement control, instituting a weapons control committee, and attempting to better educate the staff in weapons detection.  If there were not enough walk-through metal detectors at USP-Pollock, that is not attributable to Warden Keffer, but to the Bureau of Prisons.  Defendants have emphasized the fact that they were operating USP-Pollock under budget constraints.

Since Cooper has not alleged any facts or adduced any evidence to shown that Warden Keffer either actually intended to do harm to him, or took an action which was so likely to produce injury that the harm can be characterized as substantially certain to result, Warden Keffer is entitled to qualified immunity.  Therefore, since there are no genuine issues of material fact which would preclude a summary judgment, Warden Keffer's motion for summary judgment should be granted.

<u>Rick Marques</u>

Cooper alleges in his complaint that Rick Marques failed to take sufficient disciplinary action against Jeffs (and other inmates accused of assaults and weapons possession), failed to transfer or prosecute Jeffs, failed to refer Jeffs to the U.S.

Attorney for prosecution, failed to confine Jeffs in the SHU, and did not ensure there were enough metal detectors and other ways to control weapons in USP-Pollock (Doc. 13).

Marques states in his affidavit that he believes USP-Pollock had about ten walk-through metal detectors during the first half of 2008, which were monitored by staff, the staff had hand-held "wand" metal detectors to scan inmates' outer clothing and cells for concealed metal items, both inside and outside the housing units, (Doc. 14).   Marques further states in his affidavit that he personally believes pat down searches and routine cell searches are the best way to detect contraband and weapons because inmates know how to bypass metal detectors and most contraband items (including weapons) are not made of metal (Doc. 14).   Marques states he implemented a policy of requiring each unit officer to conduct a minimum of five inmate cell searches on each shift (except for the morning shift), and organized routine and random "mass" searches of housing units, with good results, and occasional searches of the entire institution (Doc. 14).   Marques states that eliminating weapons from USP-Pollock was a top priority of his because inmates used weapons to injure staff members as well as other inmates (Doc. 14).

Marques states in his affidavit that he was a member of the "weapons committee" which was organized at USP-Pollock in about January 2008 to gather intelligence and brainstorm ideas for

26

weapons reduction (Doc. 14). Marques states they committee trained staff on weapons detection and search techniques and sought to minimize availability of materials with which to make weapons (Doc. 14). Marques also states that, if Jeffs had been well known for weapons-making, he would have directed a thorough search of Jeffs and his cell (Doc. 14). Marques further explains in his affidavit that he usually visited inmates who were injured in assaults, both to check on their well-being and to question them about the assault, but has no independent recollection of visiting Cooper in the hospital (Doc. 14).

Marques was not a disciplinary hearing officer so he did not have the authority to hear Jeffs' case, sanction Jeffs, or refer Jeffs for prosecution. Since Cooper has not alleged any facts or adduced any evidence to shown that Marques either actually intended to do harm to him, or took an action which was so likely to produce injury that the harm can be characterized as substantially certain to result, Marques is entitled to qualified immunity. Therefore, since there are no genuine issues of material fact which would preclude a summary judgment, Marques' motion for summary judgment should be granted.

<u>Anthony Garrow</u>

Defendants submitted an affidavit by defendant Anthony Garrow, who was employed as a special investigative agent (SIA) in USP-Pollock from August 2000 to September 2008 (Doc. 14). Cooper

alleges in his complaint that Garrow failed to take adequate security measures to protect Cooper from Jeffs, failed to refer Jeffs for prosecution by the U.S. Attorney, and failed to transfer Jeffs to the SHU (Doc. 13).

Garrow states in his affidavit (Doc. 14) that he helped investigate Jeffs' assault on Cooper, but was not on duty at the time of the assault.  Garrow states that, at about 7:50 p.m. staff responded to a fight in Unit C2; when they arrived, Cooper was lying on the ground, bleeding from a wound to his abdomen (Doc. 14).  Garrow states in his affidavit that Jeffs was identified as the assailant, he used a homemade sharpened weapon, and Cooper was immediately provided with medical care on-site and at the local hospital (Doc. 14).

Garrow further states in his affidavit that USP-Pollock is a high security prison and that, except for the Super Maximum Prison in Colorado, BOP's high security prisons are their most secure facilities (Doc. 14).  Garrow states that violent incidents among inmates are no uncommon in high security facilities, but there are procedures and tools used to reduce violence and weapons (Doc. 14). Garrow states in his affidavit that there were about fifteen walk-through metal detectors at USP-Pollock in 2008, mostly placed in common areas, and the staff could use hand held metal detectors ("wand detectors") during cell and housing unit searches, but that metal detectors did not detect weapons made from non-metal

28

materials (Doc. 14).  Garrow also states that pat down searches were frequently conducted on a random basis, as well as mass shakedowns of the housing units a few times per month and the entire institution (about four times in 2008) (Doc. 14).  Garrow further states in his affidavit that, when the entire institution is placed on lock down, usually following a disturbance, the entire institution is searched thoroughly, and inmates' property is searched whenever inmates are transferred to or from the SHU or another institution (Doc. 14).  Inmates also undergo a full visual (strip) search when they enter the institution or return from a social visit (Doc. 14).

Garrow explains that he was also a member of the Weapons Control Committee at USP-Pollock, which was formed around June 2008 to investigate how inmates manufactured and hid weapons and to train the staff in search techniques (Doc. 14).  Garrow states in his affidavit that he also held monthly briefings with staff to review recent weapon finds and materials, and to profile inmates who had been identified as weapon makers or possessors (Doc. 14). Garrow also explains several security upgrade projects at USP-Pollock (Doc. 14).

Garrow was not a Disciplinary Hearing Officer, and did not have the authority to hear Jeffs' case, sanction Jeffs of segregation, or refer Jeffs for prosecution.  Since Cooper has not alleged any facts or adduced any evidence to shown that Garrow

either actually intended to do harm to him, or took an action which was so likely to produce injury that the harm can be characterized as substantially certain to result, Garrow is entitled to qualified immunity.  Therefore, since there are no genuine issues of material fact which would preclude a summary judgment, Garrow's motion for summary judgment should be granted.

<u>Kenneth Montgomery</u>

In an affidavit by Kenneth Montgomery, a Unit Manager at USP-Pollock since 2000, defendants show the unit manager is responsible for the unit's operation and security and for the individual programs tailored to meet the needs of the inmates in the unit (DOC. 14).  Cooper alleges in his complaint that Montgomery, as the unit manager of C-2 in June 2008, failed to segregate Jeffs in the SHU, failed to ensure Jeffs was prosecuted for his prior violations, failed to refer Jeffs to the U.S. Attorney for prosecution, and failed to take adequate measures to ensure Cooper was safe from Jeffs, given Jeffs' disciplinary history (Doc. 13). Montgomery states in his affidavit that he served on the Unit Discipline Committee, which reviewed lower severity incident reports against inmates in the unit, and did not have the authority to sanction inmates to disciplinary segregation in the SHU or refer cases for prosecution (Doc. 14).  Montgomery states in his affidavit that there were no prior incidents between Jeffs and Cooper, and all incidents of assaults and weapons possession by

30

inmates in his unit were referred to the discipline hearing officer, who had the authority to administratively discipline inmates with more severe sanctions such as time in the SHU and loss of good conduct time (Doc. 14).

Since Cooper has not alleged any facts or adduced any evidence to shown that Montgomery either actually intended to do harm to him, or took an action which was so likely to produce injury that the harm can be characterized as substantially certain to result, and Montgomery has shown he did not have the authority to hear Jeffs' case, sanction Jeffs, or refer him for prosecution, but did refer Jeffs' case to the disciplinary hearing officer who could make that decision, Montgomery is entitled to qualified immunity. Therefore, since there are no genuine issues of material fact which would preclude a summary judgment, Montgomery's motion for summary judgment should be granted.

### Crystal Zerr

An affidavit by Crystal Zerr, a case manager at USP-Pollock, shows that case managers review inmates for appropriate custody classification, prepare inmates for release, and monitor inmates' institutional adjustment (Doc. 14). Cooper contends in his complaint that Zerr, as a member of the disciplinary unit committee, failed to place Jeffs in the SHU and failed to refer Jeffs for prosecution by the U.S. Attorney (Doc. 13). Zerr states in her affidavit that she was a member of the unit disciplinary

committee which was responsible for reviewing inmate incident reports that relate to low severity violations; higher severity violations such as serious assaults and possession of weapons were referred to the discipline hearing officer for disposition (Doc. 14).   Zerr further states in her affidavit that the Unit Disciplinary Committee can only impose lower sanctions such as commissary and phone restrictions and cannot sanction an inmate to the SHU, nor can the Unit Disciplinary Committee refer cases to the U.S. Attorney's Office for prosecution (Doc. 14).   Finally, Zerr states that she was unaware that Jeffs posed a threat of danger to Cooper (Doc. 14).

Since Cooper has not alleged any facts or adduced any evidence to shown that Zerr either actually intended to do harm to him, or took an action which was so likely to produce injury that the harm can be characterized as substantially certain to result, and Zerr has shown she did not have the authority to hear Jeffs' case, transfer Jeffs to administrative segregation, or refer Jeffs for prosecution, Zerr is entitled to qualified immunity.   Therefore, since there are no genuine issues of material fact which would preclude a summary judgment, Zerr's motion for summary judgment should be granted.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that defendants' motion for summary judgment be GRANTED and that

Cooper's claims against the remaining defendants, Keffer, Marques, Montgomery, Garrow and Zerr, be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____ day of _____, 2010.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE