U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

AUG - 4 2016

TONY R. MOORE, CLERK
BY: _____
DEPUTY

UNITED STATES DISTRICT COURT                    b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

HARDIN IZELL COOPER          CIVIL ACTION NO. 1:09-CV-00967

VERSUS                       CHIEF JUDGE DRELL

U.S. BUREAU OF PRISONS, et   MAGISTRATE JUDGE PEREZ-MONTES
al.

---

## REPORT AND RECOMMENDATION

Before the Court is a complaint filed by Plaintiff Hardin Izell Cooper ("Cooper"), *in forma pauperis,* pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971),[1] on January 14, 2009,[2] and amended on June 9, 2009 (Doc. 5) and January 4, 2010 (Doc. 13). The remaining defendants[3] are the United States Bureau of Prisons ("BOP"), Joe Keffer (former Warden of the United States Penitentiary in Pollock, Louisiana), Anthony Garrow[4] (an investigative officer formerly employed at USP-Pollock), Ricardo Marques, Jr. (a corrections officer/captain employed at USP-Pollock), Kenneth Montgomery (a

---

[1] <u>Bivens</u> defendants are federal officials brought into federal court for violating the Federal Constitution. <u>Bivens</u>-type actions may be brought only against federal agents and not federal agencies. <u>See</u> <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 486 (1994); <u>Whitley v. Hunt</u>, 158 F.3d 882 885 (5th Cir. 1998). Under <u>Bivens</u>, a plaintiff may recover damages for any injuries suffered as a result of federal agents' violations of his constitutional rights. <u>See</u> <u>Channer v. Hall</u>, 112 F.3d 214, 216 (5th Cir. 1997).

[2] Cooper's complaint was originally filed in the District of Columbia and was transferred to this Court on June 12, 2009 (Doc. 4).

[3] Cooper voluntarily dismissed his action against Dr. Melissa Hughes-Albert, Dr. Sandra Lang, and Vassil Apostolov in 2010 (Docs. 27, 29).

[4] Cooper misspelled Garrow's name as "Garo" (Doc. 1).

corrections officer/unit manager employed at USP-Pollock), and Crystal Zerr (a case manager employed at USP-Pollock).[5]

Cooper alleges that he is suing the defendants in both their individual and official capacities, and further alleges he has exhausted his administrative remedies (Doc. 1).   Cooper contends that, while he was incarcerated in USP-Pollock on June 13, 2008, he was attacked by another inmate, Todd Jeffs, and suffered life threatening stab wounds.  Cooper underwent two surgeries to repair his small bowel and abdomen and to repair nerve damage to his right forearm and restore function to his right hand.  Cooper contends he is still unable to normally hold, grab, or lift anything that requires him to open his right hand wide and extend his fingers; he cannot lift, move a certain way, or engage in any rigorous activity; he has chronic abdominal pain; and he has bouts of nausea and regurgitation.  Cooper admits he receives pain medication, pills for stomach complications, and stool softener; has a medical work restriction; and has a lower bunk pass.

Cooper alleges Defendants were deliberately indifferent to his safety despite actual knowledge of the risk of harm posed by Jeffs.  Cooper alleges that Warden Keffer, Garrow, and Marques failed to implement adequate weapon control policies. Cooper further alleges that Garrow, Marques, Montgomery, and Zerr carried out policies or customs that did not insure the safety of inmates from attacks by other inmates, which resulted in his injuries.  According to Cooper, the unconstitutional

---

[5] Defendant Dr. M. Hughes was named in the original complaint (Doc. 1).  Her name was amended to Dr. Melissa Hughes-Albert.  Cooper's action against Dr. Melissa Hughes-Albert was dismissed with prejudice (Doc. 29).  Therefore, defendant "M. Hughes" should be terminated on the docket.

policies also relate to inadequate prisoner classification and failure to segregate, control, or properly discipline dangerous inmates.   Cooper contends his attacker committed at least two prior assaults with a knife on inmates and had been sanctioned for making weapons for inmates.

Cooper also contends that metal detectors were not installed in the housing units or outside  recreation yard of the high security prison until August 2008, over seven years after it opened, due to federal budget constraints.  According to Cooper, the facility only recently implemented random body searches and housing unit searches.  Cooper seeks a jury trial, monetary damages (including punitive), costs, and attorney fees.

Defendants filed a motion for summary judgment with supporting evidence (Doc. 14).   Cooper filed an opposition to Defendants' motion (Doc. 23), to which defendants responded (Doc. 26).  The District Court granted the motion for summary judgment (Doc. 36), but the Fifth Circuit reversed the judgment[6] and remanded the case to permit Cooper to conduct discovery on whether prison officials knew that Jeffs was such a danger of his fellow prisoners that they were deliberately indifferent to the safety of other prisoners by failing to take steps to isolate Jeffs or otherwise protect other inmates from Jeffs (Doc. 42).  The Fifth Circuit left the scope of the discovery to the discretion of the District Court, but specified that discovery was to include Jeff's history of violence, his history of possession of and other involvement

---

[6] The Fifth Circuit reversed the entire judgment.  Therefore, all defendants (except Hughes-Albert, Apostolov, and Lang) and claims, including the official capacity claims and the claims against the BOP, are still pending.

with weapons in prison, and the steps prison officials took after weapons were discovered in Jeffs' cell a few days before he assaulted Cooper (Doc. 42).

After discovery was completed, Defendants filed a "motion re-urging previously filed Motion for summary Judgment" (Doc. 100), relying only on the evidence and briefs filed in the previous motion (Docs. 14, 26).  Cooper filed an opposition to the current motion for summary judgment with new evidence (Doc. 102) and Defendants filed a reply (Doc. 105).  Defendants' re-urged motion for summary judgment is now before the Court for disposition.

<u>Law and Analysis</u>

## I. The Law of Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates that a summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, [submitted concerning the motion for summary judgment], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Paragraph (e) of Rule 56 also provides the following:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be

deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material."  A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which a jury could reasonably find for the plaintiff.  See Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906 (1999).

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial.  In this analysis, we review the facts and draw all inferences most favorable to the nonmovant.  See Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989).  However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment.  See Tomalin v. Herman, 954 F.2d 1125, 1131 (5th Cir. 1992), cert. den., 506 U.S. 825 (1992).

II. Bureau of Prisons and the Official Capacity Actions

Cooper sued the Bureau of Prisons and Defendants in their official capacities, as well as in their individual capacities.

Bivens actions may be brought only against federal agents, not federal agencies. See Martinez v. City of Los Angeles, 141 F.3d 1373, 1383 (9th Cir. 1998); see also F.D.I.C. v. Meyer, 510 U.S. 471, 486 (1994); Whitley v. Hunt, 158 F.3d 882 885 (5th Cir. 1998). An inmate may not bring a Bivens action against the United States, the BOP, or its officers in their official capacities, as such claims are barred by the doctrine of sovereign immunity. See Gibson v. Federal Bureau of Prisons, 121 Fed.Appx. 549, 551 (5th Cir. 2004) (citing Hafer v. Melo, 502 U.S. 21, 25 (1991) (the real party in interest in an official-capacity suit is the governmental entity and not the named official)); Correctional Serv. Corp. v. Malesko, 534 U.S. 61 (2001).

Therefore, defendants' motion for summary judgment should be granted as to Cooper's claims against the BOP and Defendants in their official capacities.

III. Qualified Immunity

The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the official violated a constitutional right that was clearly established at the time of the incident. See Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995), cert. den., 516 U.S. 1084 (1996). Qualified immunity cloaks a police officer from personal liability for discretionary acts that do not violate well-established law. Officers have qualified immunity if their actions could reasonably have been thought consistent with the right they are alleged to have violated. See Richardson v. Oldham, 12 F.3d 1373, 1380-81 (5th Cir. 1994). Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. See Hope v. Pelzer, 536 U.S. 730 (2002).

6

Invocation of the qualified immunity defense shifts the burdens of proof in federal civil rights lawsuits brought against public officials for actions or omissions attending their performance of official duties:

> The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law.

See Bazan v. Hidalgo County, 246 F.3d 481, 489 (5th Cir. 2001) (citing Salas v. Carpenter, 980 F.2d 299, 306 (5th Cir. 1992)).

The bifurcated test for qualified immunity is: (1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident. See Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998).

The first step is to determine whether the plaintiff has alleged a violation of a clearly established constitutional right. This analysis is made under the currently applicable constitutional standards. See Hare, 135 F.3d at 325. A constitutional right is clearly established if, in light of pre-existing law, the right is apparent. Officials must observe general, well-developed legal principles. See Doe v. Taylor Independent School Dist., 15 F.3d 443, 445 (5th Cir. 1994), cert. den., 513 U.S. 815 (1994). Here, Cooper alleges that, in 2008, defendants failed to protect him from attacks by inmates who were known to be violent. The Eighth Amendment duty of prison officials to protect prisoners from violence at the hands of other prisoners was

explained at length by the Supreme Court in the 1994 case of <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).   Therefore, Cooper has alleged the violation of his clearly established constitutional right to be protected by prison officials from attacks by other inmates.

The second step, objective reasonableness, is a question of law.  The court must determine whether the conduct of the individual defendants was objectively reasonable in light of clearly established law.  <u>See Hare</u>, 135 F.3d at 327.   The analysis for objective reasonableness is different from that for deliberate indifference. For qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident.  Under that minimum standard, the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable.  <u>See Hare</u>, 135 F.3d at 328.  The qualified immunity doctrine does not protect an official whose subjective intent was to harm the plaintiff, regardless of the objective state of the law at the time of his conduct.  <u>See Douthit v. Jones</u>, 619 F.2d 527, 533 (5th Cir. 1980).

Therefore, a party seeking to avoid a qualified immunity defense must prove the official either actually intended to do harm to him, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result.  <u>See Douthit</u>, 619 F.2d at 533.

<u>IV. Failure to Protect</u>

Cooper contends the prison officials failed to protect him from a known, serious risk of harm: inmate Jeffs and his weaponry.

A. Law

For an inmate to succeed on a claim based on a failure to prevent harm, he must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) the prison official was "deliberately indifferent" to his health or safety. Failing to act with deliberate indifference to a substantial risk of harm is the equivalent of recklessly disregarding that risk. See Farmer, 511 U.S. at 836. Deliberate indifference is a subjective test and it must be shown that the official actually knew of the risk of harm to the inmate. It is insufficient to show solely that the official should have known of the risk. The official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference. See Farmer, 511 U.S. at 837.

Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration by typical means, including inference from circumstantial evidence. See Farmer, 511 U.S. at 841. A fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. See Farmer, 511 U.S. at 842. It remains open to an official to prove that he was unaware of even an obvious risk to inmate health and safety. See Farmer, 511 U.S. at 844; see also Hinojosa v. Johnson, 277 Fed.Appx. 370, 374 (5th Cir. 2008). The failure of a prisoner to give advance notice to prison officials of potential danger to the prisoner's safety is not dispositive of the issue of the official's awareness, see Farmer, 511 U.S. at 848. Nor is advance notice of a substantial risk of assault posed by a particular fellow prisoner a prerequisite. See id. at 849.

9

A prison official who actually knew of a substantial risk to inmate health and safety may be found free from liability if he responded reasonably to the risk, even if the harm was not averted.  See id. at 844.

B. Evidence

Cooper must show he was incarcerated under conditions that subjected him to a substantial risk of harm, and that defendants actually knew of the risk of harm to Cooper posed by Jeffs.

Cooper states in his affidavit (Doc. 23) that he and Jeffs were both confined in the C-2 housing unit and that, on June 13, 2008 at about 7:50 p.m., as he was exiting his cell on the upper tier of the C-2 unit, he was assaulted with and severely injured by a sharpened metal shank wielded by Jeffs.  Cooper states that he was 5'4" tall and weighed 135 pounds, while Jeffs was 6'2" tall and weighed about 200 pounds (Doc. 23).  Cooper states he had been at USP-Pollock about six weeks when the attack occurred (Doc. 23).  Cooper states that, although Garrow described the attack as a "fight," it was actually an unprovoked attack that was videotaped (Doc. 23).  Cooper sustained a deep wound to his abdomen and required emergency surgery to repair his bowel, a deep laceration to his upper right arm that required orthopedic surgery for repair of his radial nerve, an abrasion to the right rib cage area, and a cut on the left side of his nose (Doc. 23).

Cooper also states that Marques admitted to him, while Cooper was in the hospital, that Jeffs was known for "making and selling shanks" to other inmates (Doc. 23).  Jeffs had been found in possession of two metal shanks on June 4, 2008 as well

as locker doors with which to make more weapons (Doc. 23).  Marques stated in his affidavit (Doc. 14) that he does not recall visiting Cooper, although he customarily visited inmates who were in the hospital, and admitted that Jeffs was known to him as a weapons-maker.

Cooper contends that, in 2007, Jeffs was found in possession of two eight-inch shanks and pieces of a bunk bed wrapped inside his mattress and that, on June 4, 2008 (nine days before he assaulted Cooper), Jeffs was found in possession of a six-inch metal shank, a 12-inch rebar shank, and a large sheet of metal (locker doors removed for stock) with which he intended to make multiple weapons (Doc. 102-1, pp. 6-7).

Cooper submitted an August 19, 2009 press release from former U.S. Attorney Donald W. Washington, which described the conviction of an inmate for a November 2007 murder of another inmate with a metal shank (Doc. 102-2, p. 79/126).  Cooper also submitted an April 22, 2008 article concerning a statement by a USP-Pollock representative about a lock down at USP-Pollock because an inmate had stabbed a corrections officer (Doc. 102-2, p. 81/126).  The representative also cited the previous lock down in January 2008 when an inmate killed another inmate with a homemade weapon; the fact that there had been three "serious assaults" after January 4, 2008; two inmates were killed in assaults in April 2007; and two inmates were killed in assaults in November 2007 (Doc. 102-2, p. 81/126).  Three of the four inmates killed in 2007 were recent transfers to USP-Pollock (Doc. 102-2, p. 81/126).

Cooper submitted the January 18, 2008 Incident Report and Disciplinary Hearing Officer Report for Jeffs, in which he was charged with and found guilty of possession of a metal weapon (Doc. 102-2, pp. 89-92/126). The Disciplinary Hearing Officer sentenced Jeffs to a loss of 40 days of good time (Doc. 102-2, pp. 89-90/126).

On June 4, 2008, a random shakedown in Jeffs' cell revealed two homemade metal weapons, a piece of a locker broken from the top locker (belonging to inmate Rivera), and the inside of a pencil sharpener (Doc. 102-2, pp. 97, 100, 102/126). The investigator, C. Lee, noted that Jeffs was to be left in general population until the outcome of the UDC hearing (Doc. 102-2, p. 101/126). The UDC hearing was held on June 5, 2008, and the incident was referred to the DHO for further hearing (Doc. 102-2, p. 100/126). The UDC did not make any notes concerning changing Jeffs's housing pending his hearing before the DHO (Doc. 102-2, p. 100/126). On July 22, 2008, DHO Milton White found Jeffs guilty of possession of a weapon and destruction of government property over $100, and sentenced Jeffs to a loss of 67 days of good time (Doc. 102-2, pp. 94-96/126).

On June 13, 2008, Jeffs stabbed Cooper with a homemade sharpened knife (Doc. 102-2, p. 109/126). Photos of the weapon were taken by Officer Hodges, who wrote the weapon was found in the trash of Unit C-2, was eight inches long, metal, and had been used by Jeffs in his assault on Cooper (Doc. 102-2, pp. 114, 117/126).

Cooper was transported to the hospital. Jeffs was placed in the Special Housing Unit by Lieutenant Headspeth pending investigation of the incident (Doc. 102-2, pp. 109-10/126). Cooper had a deep laceration to his right upper arm and a

severe wound to his left lower abdomen with abdominal contents bulging through the wound (Doc. 102/2, p. 107/126).

On June 15, 2008, SIA Garrow recommended to Warden Keffer that Jeffs be referred to the U.S. Attorney's Office for prosecution for his assault on Cooper, because it had resulted in life-threatening injuries (Doc. 102-2, p. 112/126).  Lt. Headspeth reported in a memorandum to Capt. Marques and in an incident report that the institutional video surveillance system for June 13, 2008 showed Jeffs assaulting Cooper with a sharpened object held in his right hand, and throwing the weapon in a trash can afterward, where it was later recovered by staff (Doc. 102-4, p. 31/44).  Lt. Headspeth charged Jeffs with assault with serious injury (code 101) and possession of a weapon (code 104) , and placed him in the SHU (Doc. 102-4, pp. 32, 34/44).

On June 14, 2008, the Unit Disciplinary Committee (C. Jefferson and L. Gremillion) amended Jeffs's charges for assault to an assault without serious injury (Code 224) and possession of a weapon (code 104), and recommended loss of good time and privileges (Doc. 102-4, p. 33/44).

1. <u>Deposition and Affidavit of Warden Keffer</u>

Defendants show in their statement of undisputed facts and an affidavit by Warden Joe Keffer (Doc. 14), that Jeffs attacked Cooper on June 13, 2008 in their housing unit, stabbing Cooper in the abdomen with a homemade weapon, and prison staff responded immediately to the incident and provided Cooper with immediate medical care including transport to the local hospital.  Jeffs was disciplined within

the prison and referred for prosecution, and he had a history of disruptive conduct but did not have a reputation as a notorious weapons-maker, though he had received two incident reports for possession of a weapon. Defendants also show that Jeffs was referred for prosecution for the attack on Cooper within three days of the attack, but his previous offenses did not merit prosecution (Doc. 14).

Defendants made "numerous efforts" to reduce weapons possession and general violence at USP-Pollock, including: (1) routine pat searches of inmates, (2) random and frequent surprise cell searches, (3) constant searches of inmate property, (4) bodies and clothing, use of walk-through metal detectors "consistent with budget and resource constraints," and (5) use of hand-held metal detectors and x-ray machines to locate contraband (Doc. 14). Defendants instituted a weapons control committee in 2008, which studied the materials used by the inmates and common hiding places, and trained the staff in weapons interdiction and reduction efforts (Doc. 14). In the two-year period immediately prior to the assault on Cooper, Defendants instituted 408 disciplinary actions against inmates for possession of weapons, assault, and fighting, and referred 172 cases to the FBI, 30 of which were prosecuted by the U.S. Attorney (Doc. 14).

Montgomery and Zerr serve on the Unit Disciplinary Committees (UDCs), but the Unit Disciplinary Committees only adjudicate low severity prison incidents and do not determine which inmates are prosecuted by the U.S. Attorney, which inmates are placed in segregation, or which inmates are transferred to another facility (Doc. 14). The decision to transfer an inmate rests with the regional office staff and not

with the individual facility. However, USP-Pollock staff may submit an inmate for consideration for transfer (Doc. 14).

Keffer states he has been warden at USP-Pollock since December 9, 2007 (Doc. 102-2, p. 22/126). The budget at USP-Pollock limited the number of metal detectors available, and those were placed in areas receiving high inmate traffic, but the staff had hand held metal detectors available for use (Doc. 14). Keffer also states that he was not aware of any reason Jeffs and Cooper could not be housed together, and that Jeffs had previously been disciplined on several occasions for violating USP-Pollock rules prior to June 13, 2008, including three incidents of possession of a weapon, one incident of fighting with another inmate, and one incident of assault (Doc. 14).

Keffer testified that he was concerned about the increase in violent assaults in USP-Pollock in 2007, before he became warden there (Doc. 102-2, pp. 10-11/126). Keffer testified in his deposition that USP-Pollock was on lockdown in April or May 2007 due to a double homicide (Doc. 120-2, p. 7/126). Keffer also testified that there was a suicide and a homicide in November 2008 (Doc. 102-2, pp. 8-9/126).

Keffer thought walk-through metal detectors would be useful in the housing units because there were many weapons there (Doc. 102-2, pp. 12-13/126). Keffer did not know why there were no walk-through metal detectors in the housing units before he became warden (Doc. 102-2, p. 23/126). Keffer testified that there were walk-through metal detectors in the prison he worked in before arriving at USP-Pollock and that he spoke to Captain Marques, the associate warden for correctional services, and the business office administrator about getting walk-through metal detectors

(Doc. 102-2. Pp. 13-14/126). Keffer testified that the old metal detector in Unicor only activated if metal was carried in the area between the chest and the knees (Doc. 102-2, p. 19/126).

Keffer attended weapons committee meetings, and made several phone calls to the regional director (Jerry Maldonaldo), asking for walk-through metal detectors (Doc. 102-2, pp. 13-14/126). Keffer testified that walk-through metal detectors were not included in the 2008 budget, but Keffer found money to purchase twelve of them and they were installed in the housing units (Doc. 102-2, pp. 15-16/126).

Purchase orders to show that twelve walk-through metal detectors were ordered for USP-Pollock on July 21, 2008 (Doc. 102-2, pp. 119-125/126).

Keffer issued a January 8, 2008 memo stated that inmates were not allowed in any housing unit other than the one to which they were assigned, and listed other expected behaviors (Doc. 102-2, pp. 24-25/126).[7] Keffer testified that the January 8, 2008 memo was probably prompted by an inmate homicide that took place on January 4, 2008 (Doc. 102-2, p. 26/126). Keffer testified that there were problems at the institution with inmates being in housing units that they did not belong in (Doc. 102-2, p. 33/126). A memorandum dated October 30, 2008, states that inmates do not have the option of being pat-searched rather than clearing the metal detector (Doc. 102/2, p. 23/126).

---

[7] Cooper cites the Report and Recommendation issued in the case of Jerome Weathington, Weathington v. U.S., 2011 WL 1211509 (W.D.La.), which was a Bivens suit against various USP-Pollock employees, alleging a failure to protect from an inmate assault (Doc. 102-2, p. 84/126). In Weathington, the Court noted Keffer's written policy of not allowing inmates into any housing unit other than the one to which they were assigned.

In the event of a homicide, the institution would go on immediate lockdown, all inmates would be placed in their cells, the FBI would be called, and an FBI agent would investigate the incident at the institution (Doc. 102-2, pp. 27-28/126). Keffer explained that, when the homicide occurred, he would have been notified about the homicide by the special investigative agent and intelligence officers who reviewed the videos, the FBI, the captain, and the associate warden for correctional services (Doc. 102-2, pp. 29-30/126).

When the institution is locked down after a major incident like a homicide, the first thing done is to assign mass interview teams to gather intel (Doc. 102-2, p. 30/126). The mass interview teams would be directed by the FBI or the institution, and they would sometimes do targeted interviews (Doc. 102-2, p. 30/126). Keffer testified that they would then do mass shakedowns of the institution for drugs or weapons (Doc. 102-2, p. 30/126). Afterward, there would be after-action assessment reports, and meetings with the institution's executive staff to keep everyone informed (Doc. 1022, p. 31/126). Keffer testified that there were special meetings every time the institution went on lockdown, and that those meetings included himself, all of the associate wardens, the captain, and the special investigative agent (Doc. 102-2, pp. 32-33/126). In January 2008, the Captain at USP-Pollock was Captain Marques (Doc. 102/2, p. 33/126).

Keffer also testified there was a January 18, 2008 incident involving locating a metal weapon, which is a greatest-category offence (Doc. 102-2, p. 34/126). The inmate in that incident went before the Disciplinary Hearing Officer ("DHO") on June

17

23, 2008 (Doc. 102-2, pp. 36-37/126).   Keffer testified that the DHO is not an institution employee who reports to the warden, but is instead a regional office employee who reports to the regional director (Doc. 102-2, p. 38/126).

The institution's document on the June 4, 2008 incident involving Jeffs showed that Jeffs had materials to make more than one weapon (Doc. 102-2, p. 42/126). Keffer testified that the inmate is supposed to be notified of the charges against him within 24 hours, and go before the Unit Discipline Committee within 72 hours unless it is delayed, in which case the inmate is notified as to why it is delayed (Doc. 102-2, p. 43/126). Jeffs's report showed he went before the unit disciplinary committee and was charged with a "100-level incident," which had to be adjudicated by the DHO (Doc. 102-2, p. 45/126). The report showed Jeffs was to remain in general population until the outcome of the UDC hearing, which occurred on either June 5 or June 8 (the date on the report was partially illegible) (Doc. 102-2, p. 45/126). The unit discipline committee does not have the authority to place people in administrative detention, only lieutenants do, and Lt. C. Lee investigated and decided to leave Jeffs in general population (Doc. 102-2, pp 46-47/126). Keffer testified that it would have been appropriate to send Jeffs to administrative detention since he was charged with the manufacture of multiple weapons (Doc. 102-2, p. 47/126). Jeffs might not have been placed in administrative detention because the special housing unit at USP-Pollock was already full and overcrowded (Doc. 102-2, pp. 48-49/126).

Keffer testified that the Lieutenant had the authority to place an inmate in the special housing unit for administrative detention, and he did not know if the Captain

was reviewing the Lieutenant's decisions (Doc. 102-2, pp. 51-52/126).   Keffer explained there are two levels of lieutenant in the BOP, an operations lieutenant (GS-11) and an activities lieutenant (GS-9).  The operations lieutenant is the supervisor in charge in the institution from 4:30 p.m. to 6:30 a.m. (Doc. 102-2, p. 53/126).

After the federal correctional institution ("FCI") was opened, the USP houses some of its inmates in the administrative detention/disciplinary segregation there (Doc. 102-2, pp. 53-54/126).  Keffer testified that USP-Pollock has one of the largest population percentages with a security threat group assignment or a disruptive group assignment in the BOP, but has the smallest special housing unit (Doc. 102-2, p. 55/126).  USP-Pollock needed a larger special housing unit (Doc. 102-2. P. 56/126).

The report of the June 13, 2008 incident was prepared by the captain or the special investigative agent, was routed up through the captain, the associate warden of custody, and the warden.  The warden reviewed it, signed or initialed it, and sent it to several other people including the regional director, regional correctional services, and central office correctional services (Doc. 102-2, p. 59/126).

Notations on Jeffs's incident report showed Jeffs was a "security threat, assault P" (but he did not know what the P stood for) and "a security threat, sex offender" (Doc. 102-2. P. 61/126).  Jeffs' "inmate detail report" from the FBI shows Jeffs had previously assaulted a police officer or agent, and had sexually assaulted an inmate (Doc. 102-4, p 17/44).  Keffer did not know if the Lieutenant was required to consider Jeffs' security threat status when he determined whether he should be sent to administrative detention, but it would have been a good practice to do so (Doc 102-2,

p. 61/126). Jeffs was ordered (in writing) to be sent to administrative detention after he stabbed Cooper, and the incident was referred to the FBI (Doc. 102-2, p. 62-126).

Keffer testified that the January 4, 2008 homicide would have gone through the same administrative processing at USP-Pollock after the FBI and the U.S. Attorney's office released the case (Doc. 120-2, pp. 63-64/126).

Although Captain Marques said he requested a $50,000 upgrade in the metal detectors in 2007 because the old ones could easily be compromised, Keffer requested the metal detectors in 2008 and got the business office to pay for them (Doc. 102-2, pp. 66-68/126). Marques was involved with the discussions with Keffer concerning the new metal detectors (Doc. 102-2, p. 68/126). However, the business office would have purchased the walk-through metal detectors based on Keffer directing them to do so once the money was found (Doc. 102-2, p. 70/126).

2. Depositions and Affidavit of Captain Marques

Marques states in his affidavit that he believes USP-Pollock had about ten walk-through metal detectors during the first half of 2008, which were monitored by staff. The staff had hand-held "wand" metal detectors to scan inmates' outer clothing and cells for concealed metal items, both inside and outside the housing units (Doc. 14). Marques personally believes pat down searches and routine cell searches are the best way to detect contraband and weapons because inmates know how to bypass metal detectors and most contraband items (including weapons) are not made of metal (Doc. 14). Marques implemented a policy of requiring each unit officer to conduct a minimum of five inmate cell searches on each shift (except for the morning

shift), and organized routine and random "mass" searches of housing units, with good results, and occasional searches of the entire institution (Doc. 14).  Eliminating weapons from USP-Pollock was a top priority because inmates used weapons to injure staff members as well as other inmates (Doc. 14).

Marques was a member of the "weapons committee" which was organized at USP-Pollock in about January 2008 to gather intelligence and brainstorm ideas for weapons reduction (Doc. 14).  Marques stated the weapons committee trained the staff on weapons detection and search techniques and sought to minimize availability of materials with which to make weapons (Doc. 14).  Marques also stated that, if Jeffs had been well known for weapons making, he would have directed a thorough search of Jeffs and his cell (Doc. 14).  Marques usually visited inmates who were injured in assaults, both to check on their well-being and to question them about the assault, but had no independent recollection of visiting Cooper in the hospital (Doc. 14).

Cooper submitted portions of a November 2012 deposition of Marques (Doc. 102-6, p. 2/60; 102-5, pp. 4-5/12).  Marques testified that he remembered most of the shanks at USP-Pollock being metal (Doc. 102-6, p. 7/60).  Marques testified that a weapons committee met at USP-Pollock that met at least once a month, to try to determine where the shanks were coming from (Doc. 102-6. pp. 7-8/60).  As Captain, Marques oversaw all of the housing units.  At first, they had hand-held metal detectors in all the housing units, and later they had walk-through metal detectors (Doc. 102-6, pp. 10-11/60).  Marques testified that, if shanks were found in several cells and in one particular unit, they would lock down that unit and conduct a mass

21

shakedown of the unit, but there wasn't a policy requirement them to do so (Doc. 102-6, pp. 11-12/60). If multiple weapons were found in one cell, that inmate needed to be targeted and watched (Doc. 10-6, p. 13/60). If one person was in the process of manufacturing multiple shanks or had already done some of that, he would want to shakedown the entire institution (Doc. 102-6, p. 13/60). In addition, if a lot more weapons than normal were found, the unit they were found in would be targeted for monthly mass shakedowns (Doc. 102-6, pp. 14-15/60). However, there was no written shakedown policy (Doc. 102-6, p. 13/60). Marques also testified there was a policy, in 2008 and before, to transfer one of the inmates involved in an assault between two or more inmates (Doc. 102-6 p. 18/60).

Marques testified that Lt. Craig Lee wrote the incident report charging Jeffs with possession of weapons code 104, a greatest offense category, on June 4, 2008 (Doc. 102-6, pp. 19-20/60). It was not the practice for the lieutenants to send him the incident reports, but instead to inform him of weapons found at the weekly SIS meetings (Doc 102-6, p. 20/60). Lieutenant Craig Lee made the decision to leave Jeffs in general population, and that Marques would not have reviewed that decision (Doc. 102-6. pp. 20-21, 23/60). If there was room in the SHU, an inmate with a low moderate incident report should have been put in the SHU (Doc. 102-6, pp. 22-23/60). After weapons were found, a shakedown might have been conducted although not necessarily right away and not necessarily in the same unit in which the weapons were found (Doc. 102-6, p. 24/60). Each unit had a "Unit Shakedown Log" and institution-wide shakedowns were recorded in the daily log (Doc. 102-6, pp. 24-25/60).

A lieutenant could decide to conduct a mass shakedown in a unit, but the Captain should be notified of it so that he can notify the warden or associate warden (Doc. 102-6, p. 25/60).  Marques also testified that, as a Captain, he did not review DHO reports but would learn what sanctions the DHO imposed in the Special Housing Unit meetings (Doc. 102-6, p. 27/60).  When he was Captain, he spoke with most of the inmates, visited the SHU daily, and visited the hospital regularly to check on the inmates and the officers (Doc. 102-6, pp. 29-30/60).

Marques did not recall the shank attack by Jeffs on Cooper and he usually left the investigation and review of the videos up to the SIS office, but sometimes he assisted in the investigation (Doc. 102-6, p. 32/60).  The incident with Cooper occurred on June 13 and the report was usually written on the date of the incident, but in Cooper's case, it was written on June 15 (Doc. 102-6, pp. 33-34/60).  Marques would receive a "583 packet" within 24 to 48 hours of an incident, which would include incident reports, medical assessments, photos, and administrative detention orders (Doc. 102-6, pp. 37-40).  Marques would review, sign, and forward the 583 packet to the associate warden for review (Doc. 102-6, pp. 37-40).  Marques agreed that he would be able to talk to the lieutenant, after an incident, and ask why someone was not placed in administrative detention (Doc. 102-6, p. 41).  The incident report showed the incident was "assault with serious injury" with a line through it and DHO Milton White's initials, and "224" (assault without serious injury) written in (Doc. 106-2, p. 43/60).  Marques further testified that that June 13, 2008 administrative detention

order for Jeffs, from Lt. Headspeth to the Special Housing Unit, showed greatest category offenses 101 and 104 (Doc. 102-6, p. 45/60).

Marques was involved in procuring the walk-through metal detectors (Doc. 102-6, pp. 46-7/60). For a time while Marques was a captain at USP-Pollock, there were no walk-through metal detectors in the entranceways of the three men's housing units (Doc. 102-6, pp. 49-50/60).

Cooper submitted an additional deposition by Marques taken in December 2015 (Doc. 102-5, pp. 4-5/12). Marques testified that the Lieutenant's log for June 12, 2008 showed every significant event that took place on that shift, including count times, opening chow hall, opening work halls, SHU count, and changes in housing unit assignments (Doc. 102-5, pp. 5-6/44). The BOP has retention requirements for how long log books have to be kept, but Marques did not know if USP-Pollock still had the SHU log books for June 2008 (Doc. 102-5, pp. 6-7/12).

Marques testified that, sometime in 2008, they started using the B-1 housing unit for inmates who made an unverified claim of a threat in the compound and did not want to return to general population (Doc. 102-5, p. 6/12). In 2008, an inmate would be transferred to the SHU if that inmate's presence in general population posed a threat to life, property, staff, self, other inmates, the public, security, or the orderly running of the institution, or if an inmate was under investigation for awaiting a hearing or for violating BOP regulations or criminal law (Doc. 102-5, pp. 7-8/12). Marques testified there used to be overcrowding issues with the SHU (Doc. 102-5, pp. 8-9/12). If the DHO ordered an inmate to the SHU, the inmate would be place in the

SHU regardless if it was overcrowded (Doc. 102-5, p. 9/12). Marques further testified that, after Jeffs was charged with possession of a weapon on June 4, 2008, there was no requirement that he be placed in the SHU (Doc. 102-5, pp. 10-11/12). Marques thinks the SHU at USP-Pollock was full at that time (Doc. 102-5, p. 11/12).

    3.  <u>Deposition of Lieutenant Craig Lee</u>

Cooper submitted a deposition by Craig C. Lee (Doc. 102-7). Lee was a lieutenant at USP-Pollock (Doc. 102-7, pp. 8-9). Lee testified that an Inmate Detail Report gives any staff member that is in contact with an inmate a better understanding of the inmate's documented history (Doc. 102-7, p. 10/47). The inmate's history is not necessarily his security classification (Doc. 102-7, p. 10-47). All of an inmate's disciplinary records are kept in the Century database (Doc. 102-7, p. 11/47). Lee testified that there was no written criteria as to when to convert an inmate to administrative detention, and that it was left up to him, as the lieutenant (Doc. 102-7, p. 15/47). Lee recalled being told not to overcrowd the SHU with three-man bunks (Doc. 102-7, p. 15/47).

In 2008, copies of an administrative detention order were sent to the inmate, special housing, the captain, and the unit manager (Doc. 201-7, p. 16/47). The Captain reviewed administrative detention orders (Doc. 102-7, p. 17/47). Lieutenants have autonomy to lock up an inmate in the SHU, but Lee could discuss it with them later, after he had reviewed the order, if he did not agree with it (Doc. 102-7, p. 18/47). A captain could override and change a lieutenant's administrative detention order (Doc. 102-7, pp. 18, 20/47). An incident report would be copied into a

logbook and placed in a box for a unit disciplinary committee, which may send it to the disciplinary hearing officer, but it would not be routed to the captain (Doc. 201-7, pp. 22-23/47).

Lee testified that, after Officer Craig found weapons in Jeffs's cell during a shakedown, he investigated and wrote an incident report on June 4, 2008 (Doc. 102-7, pp. 26-27/47). The day watch shift had left Jeffs in general population during the day, possibly due to lack of space, and Jeffs was still there when he investigated during the night shift (Doc. 102-7, pp. 28, 31/47). Lee would not normally have changed the day watch shift's decision on whether or not to lock an inmate in the SHU (Doc. 102-7, p. 26/47).

An inmate charged with possession of two weapons and metal material would not normally have been assigned to administrative detention in USP-Pollock in 2008 because metal was found every day there (Doc. 102-7, p. 29/47). Lee testified that the fact that Jeffs had metal material led him to believe Jeffs would make weapons with it (Doc. 102-7, p. 29/47). Lee testified that the entry on Jeffs's June 4 incident report, stating Jeffs was to remain in the general population until the outcome of the UDC hearing (which was June 5, 2008), was written by the unit team member who conducted the UDC hearing (Doc. 102-7, pp. 36-38/47). If the unit team member decided that Jeffs would remain in general population pending a DHO hearing, Lee, as the Lieutenant, would not have any power to order him to administrative detention because he would not have been notified of the outcome of the UDC hearing (Doc. 102-7, p. 38/47).

Jeffs would have had his weapons taken away from him (Doc. 102-7, p. 40/47). Lee testified that the UDC could have recommended to the lieutenant that Jeffs be put in the SHU, and the lieutenant would have been the one to send Jeffs to the SHU (Doc. 102-7, pp. 41-42/47). The UDC did not recommend that Lee put Jeffs in administrative detention (Doc 102-7, p. 43/47). There was no review of the UDC's decision to leave Jeffs in general population until the DHO made his determinations (Doc. 102-7, p. 38/47). The DHO could place the inmate in administrative segregation as a sanction (Doc. 102-7, p. 39/47).

### 4. Deposition of Unit Manager Montgomery

Cooper submitted the deposition of Kenneth Montgomery, a unit manager (Doc. 102-8, pp. 2, 18/27). Montgomery testified that the UDS did not have the authority to put an inmate in administrative detention pending a hearing (Doc. 102-8, p. 6/27). Rather, only a lieutenant or captain could put an inmate in the SHU, so the UDC could call them an recommend the inmate be placed in the SHU (Doc. 102-8, p. 6/27). Montgomery also testified that an inmate charged with a greatest category offense would already be in special housing when the UDC received the report and held its hearing (Doc. 102-8, p. 7/27). However, Montgomery testified that the UDC did not hear greatest category offenses (Doc. 102-8, p. 8/27).

Montgomery further testified that a DHO packet is put together, with the incident report, memos, and statements, and archived by the DHO secretary (Doc. 102-8, p. 9/27). The DHO report showed the committee referred the incident to the DHO because it was a greatest category offense, and recommended that Jeffs lose 60

days good conduct time (Doc. 102-7, pp. 13-14/27). Montgomery testified that it was normal procedure for the UDC to make a recommendation to the DHO for sanctions, contingent upon the DHO's findings (Doc. 102-8, p. 22/27). If a greatest category offense occurred in his unit, Montgomery would have been advised of it (Doc. 102-7, p. 19/27). The UDC normally did not recommend placement in the SHU because the captain or lieutenant usually did that (Doc. 102-8, p. 22/27). Montgomery did not have anything to do with the decision to keep Jeffs in general population (Doc. 102-7, pp. 24-25/27).

### 5. Deposition of Officer Craig

BOP Corrections Officer Patrick Craig testified in a deposition that, in 2008, whether an inmate offense was categorized as an "assault without serious injury" (a 224 offense) or an "assault with serious injury" (a 101 offense) depended on whether a weapon was used, whether the victim has to go to an outside hospital, and the diagnosis (Doc. 102-4, pp. 7-9/44). Craig also testified that the metal lockers were made of thin gauge metal in 2008, but were changed to lockers made of wire mesh with metal trim a few years later (Doc. 102-4, p. 11/44). The new lockers are thicker and supposed to be more difficult for inmates to cut (Doc 102-4, p. 11/44). Craig did not investigate to determine where the rebar and the materials for Jeffs' June 2008 weapons came from (Doc. 102-4, p. 13/44).

### 6. Affidavit of Anthony Garrow

Defendants submitted an affidavit by defendant Anthony Garrow, who was employed as a special investigative agent (SIA) in USP-Pollock from August 2000 to

September 2008 (Doc. 14).  Cooper alleges in his complaint that Garrow failed to take adequate security measures to protect Cooper from Jeffs, failed to refer Jeffs for prosecution by the U.S. Attorney, and failed to transfer Jeffs to the SHU (Doc. 13).

Garrow states in his affidavit (Doc. 14) that he helped investigate Jeffs' assault on Cooper, but was not on duty at the time of the assault.  At about 7:50 p.m. staff responded to a fight in Unit C2; when they arrived, Cooper was lying on the ground, bleeding from a wound to his abdomen (Doc. 14).  Jeffs was identified as the assailant, he used a homemade sharpened weapon, and Cooper was immediately provided with medical care on-site and at the local hospital (Doc. 14).

Garrow further stated in his affidavit that USP-Pollock is a high security prison and that, except for the Super Maximum Prison in Colorado, BOP's high security prisons are their most secure facilities (Doc. 14).  Garrow stated that violent incidents among inmates are not uncommon in high security facilities, but there are procedures and tools used to reduce violence and weapons (Doc. 14).  There were about fifteen walk-through metal detectors at USP-Pollock in 2008, mostly placed in common areas, and the staff could use hand held metal detectors ("wand detectors") during cell and housing unit searches.  But metal detectors did not detect weapons made from non-metal materials (Doc. 14).  Garrow also stated that pat down searches were frequently conducted on a random basis, as well as mass shakedowns of the housing units a few times per month and the entire institution (about four times in 2008) (Doc. 14).  When the entire institution is put on lock down, usually following a disturbance, the entire institution is searched thoroughly, and inmates' property is

searched whenever inmates are transferred to or from the SHU or another institution (Doc. 14).  Inmates also undergo a full visual (strip) search when they enter the institution or return from a social visit (Doc. 14).

Garrow explained that he was also a member of the Weapons Control Committee at USP-Pollock (Doc. 14).  Garrow also held monthly briefings with staff to review recent weapon finds and materials, and to profile inmates who had been identified (Doc. 14).

Affidavit of Kenneth Montgomery

In an affidavit by Kenneth Montgomery, Defendants show the unit manager is responsible for the unit's operation and security and for the individual programs tailored to meet the needs of the inmates in the unit (DOC. 14).  Cooper alleged in his complaint that Montgomery, as the unit manager of C-2 in June 2008, failed to segregate Jeffs in the SHU, failed to ensure Jeffs was prosecuted for his prior violations, failed to refer Jeffs to the U.S. Attorney for prosecution, and failed to take adequate measures to ensure Cooper was safe from Jeffs, given Jeffs' disciplinary history (Doc. 13).

Montgomery stated in his affidavit that he served on the Unit Discipline Committee, which reviewed lower severity incident reports against inmates in the unit, and did not have the authority to sanction inmates to disciplinary segregation in the SHU or refer cases for prosecution (Doc. 14).  There were no prior incidents between Jeffs and Cooper, and all incidents of assaults and weapons possession by inmates in Montgomery's unit were referred to the DHO, who had the authority to

administratively discipline inmates with more severe sanctions such as time in the SHU and loss of good conduct time (Doc. 14).

7. Affidavit of Crystal Zerr

An affidavit by Crystal Zerr, a case manager at USP-Pollock, shows that case managers review inmates for appropriate custody classification, prepare inmates for release, and monitor inmates' institutional adjustment (Doc. 14). Cooper contends in his complaint that Zerr, as a member of the disciplinary unit committee, failed to place Jeffs in the SHU and failed to refer Jeffs for prosecution by the U.S. Attorney (Doc. 13).

Zerr stated in her affidavit that she was a member of the unit disciplinary committee that was responsible for reviewing inmate incident reports that relate to low severity violations; higher severity violations such as serious assaults and possession of weapons were referred to the DHO for disposition (Doc. 14). Zerr further stated that the Unit Disciplinary Committee can only impose lower sanctions such as commissary and phone restrictions, and cannot sanction an inmate to the SHU, nor can the Unit Disciplinary Committee refer cases to the U.S. Attorney's Office for prosecution (Doc. 14). Finally, Zerr stated that she was unaware that Jeffs posed a threat of danger to Cooper (Doc. 14).

8. Deposition of Plaintiff Cooper

Cooper submitted his own deposition (Doc. 102-3). Cooper arrived at USP-Pollock on April 29, 2008 (Doc. 102-3, p. 11/20). Jeffs approached him and asked him whether he was in a gang, and Cooper denied it and told Jeffs he was from New

31

Orleans (Doc. 102-3, p. 8/20). Jeffs told him he made and sold knives and asked if Cooper needed one. Cooper refused, then Jeffs told Cooper that he was sexually interested in him (Doc. 102-3, p. 8/20). Cooper testified that he told Jeffs he was not interested, so Jeffs told him not to tell anyone because he had to protect his reputation (Doc. 102-3, p. 8/20). Cooper felt like Jeffs became worried about having revealed his sexual orientation to Cooper (Doc. 102-3, p. 9/20). Cooper is 5'6" tall and weighs between 130 and 140 pounds, while Jeffs is about 6'2" and weighs between 190 and 205 pounds (Doc. 102-3, p. 9/20). Cooper testified that Jeffs was arrogant, dominant, and self-centered (Doc. 102-3, p. 9/20).

Cooper testified that Jeffs obtained materials to make weapons from the HVAC facility (where he worked), from the bleachers (by putting something on the bleachers, letting it soak and dissolve for a minute, then breaking off pieces), from breaking pieces from the exit signs and the trim around the dormitory lights, and by cutting pieces from the metal bunk beds with dental floss (Doc. 102-3, pp. 9-10/20). Cooper testified that, when he was Jeffs's cellmate, Jeffs showed him his metal shanks (Doc. 102-3., p. 10/20). Jeffs accepted postage stamps or commissary items in payment for his shanks (Doc. 102-3, p. 10/20). Cooper never carried a weapon while he was in USP-Pollock, and stayed out of trouble (except for some minor infractions) because he was in for a short time (Doc. 102-3, p. 10/20). Cooper was in the SHU one time, when he was healing after his surgeries (Doc. 102-3, p. 19/20).

Cooper testified that, on June 13, 2008, he had walked out of his cell to put something in the trash can when he noticed Jeffs watching him, then he walked past

32

Jeffs and felt something (Doc. 102-3, p. 13/20).   Cooper testified that he turned around, Jeffs threw up his arm, Cooper also threw up his arm and blocked Jeffs, saw Jeffs had a weapon in his hand, and then Cooper grabbed him and ran him into the wall (Doc. 102-3, p. 13/20).  Jeffs then broke loose and stabbed Cooper in the arm and his stomach, and Cooper fled downstairs (Doc. 102-3, p. 13/20).  Jeffs chased Cooper until a guard arrived when Jeffs was half-way down the stairs (Doc. 102-3, p. 13/20).  Cooper had been stabbed twice (Doc. 102-3, p. 14/20).

Cooper testified that he had not spoken to Jeffs for a week before the assault, after he had given Jeffs some books of stamps (Doc. 102-3, p. 13/20).   Cooper speculated that Jeffs assaulted him because he had told Cooper private information about himself, or because he was aggravated with others and took it out on Cooper, who was smaller and probably seemed like an easy target (Doc. 102-3, p. 14/20).

Cooper had abdominal surgery, followed by physical therapy for several months, because his intestine protruded from the stab wound and his small intestine was punctured (Doc. 102-3, pp. 14, 16/20).   Cooper had pain from the wounds (soreness and staples) and the daily dressing changes for about six weeks, drowsiness from the pain medications, and nausea when he tried to eat (Doc. 102-3, p. 15/20). Cooper testified that, now, he still has nausea about once every two weeks, has been vomiting lately, and has numbness and shooting pain (Doc. 102/3, p. 15/20).  Cooper can no longer lift more than 150 pounds (Doc. 102-3. P. 16/20).

Cooper had surgery on his arm to repair a severed nerve (Doc. 102-3, p. 16/20). Cooper testified that he could not move his hand for about eight months before it

began progressively improving (Doc. 102-3, p. 16/20). His right hand is dominant and his right arm is not as strong as it used to be, he has trouble gripping large objects, like a football, and he has trouble gripping a pen (Doc. 102-3, pp. 17-18/20). The nerves in the middle finger of his right hand are injured (Doc. 102-3, p. 4/20).

Cooper testified that the atmosphere at USP-Pollock was scary because of the level of violence, the tower alarm was always going off, and there were many lockdowns (Doc. 102-3, p. 11/20). The prison officials would sometimes do pat searches of everyone entering a housing unit and they would use handheld metal detectors on so many inmates each hour to check for weapons (Doc. 102-3, p. 12/20). Cooper testified that walk-through metal detectors were installed in September 2008 (Doc. 12-3, p. 12/20).

9. <u>Documentary Evidence</u>

Cooper contends that Jeffs has a history as an inmate sex offender and for inmate assaults, and that he previously attacked at least two inmates with metal shanks, causing severe injuries (Doc. 23). Defendants state that Jeffs did not have any prior incidents of assaulting inmates with a dangerous weapon (Doc. 14).

Cooper submitted a BOP document that shows Jeffs has classification notes of "assault-police officer/agents," "sexually assaulted an inmate," and "sex offender" (Doc. 4-2, p. 17/44). Cooper also submitted a "card file roster" which shows: (1) on March 6, 2007, Jeffs was involved in a physical altercation with inmate John Dreizler that resulted in injuries; (2) on October 19, 2007, Jeffs and inmate Michael Mathis struck and kicked inmate Jesus de Jesus; (3) on June 13, 2008, Jeffs assaulted Cooper

with a metal shank, injuring him; and (4) on Friday, January 2, 2009, Jeffs and inmate Daniel Rodriguez assaulted inmate Manuel Borrego with fists (Doc. 102-2, p. 118/126). Cooper also submitted a "Form 583" report dated November 1, 2010, to show that Jeffs assaulted and sexually touched, without injury, inmate Erickson Dominquez-Gonzalez, who reported it to staff (Doc. 102-4, pp. 29-30/44). Cooper submitted the DHO's report for Jeffs' June 4, 2008 possession of a weapon and destruction of government property (Doc. 102-4, pp. 37-40, 42-43/44).

To show that Jeffs was a known weapons-maker and a violent inmate, Cooper submitted Jeffs' inmate discipline data (Doc. 102-4, pp. 21-28/44) which showed the following weapons possession and violent offenses:

| Incident Dates | Offenses |
|---|---|
| March 6, 2007 | Fighting with another inmate [John Dreizler] |
| August 30, 2007 | Possession of homemade body armor |
| October 11, 2007 | Possession of two 8" shanks and pieces of a bunk bed |
| October 19, 2007 | Assault on another inmate resulting in minor injury [Jesus de Jesus] |
| January 18, 2008 | Possession of a dangerous weapon (6.5" shank) |
| June 4, 2008 | Possession of a dangerous weapon (12" rebar shank, 6" flat metal shank, and locker doors) and destruction of property |
| June 13, 2008 | Possession of a dangerous weapon (shank), and assault without serious injury (Code 224) [assault on Cooper] |
| September 25, 2008 | Possession of a dangerous weapon (6" shank) |

35

| January 2, 2009 | Assault without serious injury (code 224) [Manuel Borrego] |
| April 8, 2010 | Fighting with other inmates |
| May 15, 2015 | Fighting with other inmates |
| June 15, 2010 | Fighting with other inmates |
| November 1, 2010 | Making a sexual proposal/threat and assaulting without serious injury (code 224) [Erickson Dominguez-Gonzalez] |
| January 9, 2011 | Threatening bodily harm and engaging in sexual acts |
| February 15, 2011 | Fighting with other inmates |

C. Analysis

Cooper alleges that, although USP-Pollock is classified as a "high security" prison, there were no metal detectors in the housing units until 2008, sometime after Jeffs's June 13, 2008 assault on Cooper, when they were installed in the housing units in an attempt to control the occurrence of inmate assaults. Cooper also alleges that the metal detectors were often unmanned by an officer and that, sometimes, the officers ignored them when inmates failed to clear them. Cooper states Defendants did not install metal detectors in the housing units' entrances or in the recreation yard, which is not consistent with the practices in other "high security" BOP facilities (Doc. 23). Cooper states in his affidavit that Jeffs's shank was made of metal (Doc. 23), but defendants have not admitted that and state in their affidavits (Doc. 14) that metal detectors do not detect weapons made of non-metal substances.

Defendants have continuously maintained there is no evidence that Jeffs assaulted Cooper with a metal shank.   The court takes judicial notice that Jeffs was indicted on February 25, 2009 for assaulting Cooper with a dangerous weapon–an eight-inch homemade *steel* shank–with intent to bodily harm.   Jeffs pleaded guilty and was sentenced to 95 months imprisonment by the United States Court for the Western District of Louisiana.   See <u>USA v. Jeffs</u>, 1:09-cr-00032 (W.D. La.).   Therefore, pursuant to Jeffs' charge and guilty plea, the Court finds there is *no issue* as to the fact that Jeffs attacked Cooper with a *metal* shank.

In his complaint, Cooper alleges Warden Keffer: (1) failed to properly protect Cooper from the assault by Jeffs; (2) failed to take sufficient disciplinary actions against inmates accused of assault or possession of weapons; (3) failed to have sufficient metal detectors; (4) failed to control weapons in USP-Pollock; and (5) failed to refer inmates guilty of assault with dangerous weapons to the U.S. Attorney for prosecution or confine them in the SHU (Doc. 13).

Defendants show in their affidavits, discussed below, that budget constraints limited the number of walk-through metal detectors in use at USP-Pollock, but the staff had hand-held metal detectors.   Several other weapons-control measures were implemented as well, to find weapons made of other materials as well as metal weapons.   Although Cooper states that many of the weapons-controls measures were not implemented prior to 2008, he does not allege or show which, if any, measures were not implemented prior to the June 13, 2008 attack on him (other than lack of

metal detectors in the housing units) and whether, had they been implemented sooner, they would have made any difference in his assault.

Cooper also states in his affidavit that there was an inmate assault with a metal shank (by inmate Robert Oviedo) the day before Cooper was assaulted, just two floors above Cooper's cell, but there were no searches conducted and the inmates were not placed on lockdown (Doc. 23). Cooper argues that, had the C-2 housing unit been placed on lockdown, Jeffs could not have attacked him. Cooper is confused. Garrow showed in his supplemental affidavit (Doc. 26) that an assault that took place on June 12, 2008 in Unit A-3, which is located on the opposite side of the prison compound, about 200 yards away from Unit B-4, where Cooper's assault took place on June 13, 2008. Marques testified that another assault took place on June 13, the same day as the assault on Cooper, but in the C-2 unit, and both B-4 and C-2 were locked down on June 13 due to the assaults (Doc 102-6, p. 35/60).

Garrow also shows in his affidavit that, due to new, enhanced security measures for controlled inmate movements and segregated confinement at USP-Pollock in 2008, inmates from Unit A-3 and Unit C-2 were kept isolated from one another virtually all of the time (Doc. 26). Garrow shows the June 12, 2008 assault in A-3 was an incident between two inmates involved with the same gang over internal gang issues, and did not appear to be indicative of a wide-spread problem that could impact the security of other housing units. An institution-wide lockdown (which would include a lockdown of C-2) was not warranted, nor was a search of Unit C-2 warranted (Doc. 26). Therefore, Cooper's claim that the C-2 housing unit should

have been on lock down on June 13, 2008 due to the June 12, 2008 assault in A-3 is meritless.

Cooper next alleges he was assaulted by Jeffs because there was a pattern of assaults on new inmates at USP-Pollock. However, Garrow states in his supplemental affidavit (Doc. 26) that the three prior homicides pointed out by Cooper—involving victims Tyrone Johnson, Donald Till, and William Bullock—did not establish a pattern of homicides of new inmates. Till's death was labeled a suicide by the coroner (Doc. 26). Johnson initiated an assault on another inmate, and then carried the assault to a second inmate who ended up killing Johnson (Doc. 26). Finally, Bullock was a new inmate, but his death was believed to be the result of internal issues between Bullock and his assailant, and not because he was a new inmate (Doc. 26). Therefore, Cooper's claim that there was a pattern of attacks on new inmates at USP-Pollock is unsupported.

Cooper contends that Jeffs was found with an arsenal of metal weapons and materials to make weapons just eight days before he assaulted Cooper: a 6" flat metal shank, a 12" rebar shank, and locker doors to be used as weapon-making material. However, a disciplinary hearing had not been held on Jeffs despite BOP policy to do so within 72 hours, and Defendants elected not to charge Jeffs with "greatest category" offenses (Doc. 23). In addition, as of June 13, a disciplinary hearing had not yet been held on Jeffs' January 18 offense of possessing a metal shank. Cooper states that a hearing was not held on all of Jeffs' 2008 offenses until June 23, 2008, ten days after Jeffs' June 13 assault on Cooper (Doc. 23).

Defendants have not refuted Cooper's allegations concerning Jeffs' possession of locker doors as stock material with which to make weapons, although Marques denies that Jeffs was known to be a weapons maker. BOP policy, in Program Statement 5270.07[8] states "Code 104 - Possession, manufacture, or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, or any ammunition" is a "greatest category offense." Keffer (Doc. 14-5, No. 11), Marques (Doc. 14-6, No. 16), and Garrow (Doc. 14-7, No. 21) admit that Jeffs had previous disciplinary charges for possession of weapons. Defendants have not addressed Cooper's allegation that, had Jeffs been placed in segregation following the discovery of his weapons on June 5, 2008 and pending the investigation, or had Jeffs' disciplinary hearing (UDC) been held within three days of June 5, 2008, Jeffs would have been in lockdown on June 13, 2008 and would not have been able to attack Cooper.

However, Cooper's argument assumes Jeffs would not have attacked him on a different date. Moreover, the Unit Disciplinary Committee would have had to refer Jeffs to the DHO, since he was charged with a greatest category offense. There is no time limit for the hearing before the DHO. See Program Statement 5270.07. The UDC would also have had to recommend to the Captain that Jeffs be placed in the SHU and the Captain would have had to accept their recommendation. Therefore, even had the Unit Disciplinary Committee timely convened for Jeffs' case after his

---

[8] BOP policies are available at the BOP website at http://www.bop.gov.

June 4, 2008 offense, the case would have been referred to the DHO and Jeffs would not necessarily have been held in segregation pending that hearing.

Therefore, Cooper's argument that he would not have been attacked and injured had defendants held Jeffs's UDC hearing (on his June 5 weapons charge) within 72 hours, because he would have been in the SHU, is also meritless.

Cooper erroneously claims defendants failed to refer Jeffs for prosecution. However, Jeffs was referred for prosecution, and he was charged with and pleaded guilty to assault on an inmate with a dangerous weapon with intent to do bodily harm and without just cause or excuse, pursuant to 18 U.S.C. § 113(a)(3). Jeffs was sentenced to 95 months imprisonment. See USA v. Jeffs, 1:09-cr-00032 (W.D.La.).

Cooper states that unnamed persons at USP-Pollock have been intentionally under-reporting the severity of assaults by failing to include the fact that the assaults involved the use of weapons or resulted in injuries, citing an assault that took place on December 28, 2008 (Doc. 23). Since Cooper does not allege that any of the named defendants have under-reported assaults, has not shown that his assault was under-reported (it obviously was not under-reported since it was referred for prosecution), and since the assault cited by Cooper took place several months after his assault, this allegation appears to be irrelevant to Cooper's case.

Cooper contends USP-Pollock transferred out dangerous prisoners in 2009, but did not do so prior to then (Doc. 23). Apparently, Cooper is contending that, had Defendants transferred Jeffs out of USP-Pollock because he was dangerous, Jeffs would not have assaulted him. Again, this contention is unsupported. Marques

states that in 2008, whenever inmates were involved in serious assaults with weapons at USP-Pollock, one of the inmates involved was submitted by the institution for transfer consideration (Doc. 14). Warden Keffer states that the BOP regional office made all decisions regarding transfer of inmates, and noted that USP-Pollock was a high security facility (Doc. 14). Therefore, although Defendants could recommend that an inmate be transferred, they did not make the decision to transfer an inmate.

Moreover, Marques states, defendants show in their statement of undisputed facts, and the Cooper's evidence shows that Jeffs was not involved in a serious assault with a weapon prior to June 13, 2008 (Docs. 14, 102-4, pp. 21-28/44). Although Jeffs's disciplinary is replete with fights, assaults without a weapon, and possession of weapons and weapons materials, the assault on Cooper with a metal shank is Jeffs' only a serious assault with a weapon. Therefore, Jeffs' transfer was not warranted.

1. Warden Keffer

Warden Keffer stated that Jeffs' disciplinary history did not earn him a reputation as an unusually violent inmate in need of constant segregation or transfer, since USP-Pollock is a high security prison (Doc. 14). Marques explained that policy in his affidavit, stating that, although an inmate may be housed in the SHU if he is under investigation for committing an infraction, an inmate known to have possessed weapons in the past would be housed in the SHU while the investigation was pending or as an actual sanction for being found guilty administratively (Doc. 14). Jeffs was housed in the SHU on and off during Marques' tenure at USP-Pollock, either for

investigation or as a sanction (Doc. 14). Anthony Garrow stated that Jeffs' discipline record of weapons possession and fighting is modest when compared with many other inmates, and would not necessarily have placed him under additional scrutiny by the investigative staff (Doc. 14).

Warden Keffer further stated that, typically, the U.S. Attorney prosecuted only severe offense cases, such as assaults causing bodily injury, assaults on staff, inmate on inmate assaults with weapons, and homicides. Garrow stated that the U.S. Attorney's Office and the BOP established guidelines that governed inmate prosecutions and, in 2008, severe incidents such as homicides and assaults with bodily injury were generally accepted for prosecution, while all others were handled administratively (Doc. 14).

Defendants have not explained why Jeffs' charge for his assault on Cooper was downgraded from assault with serious injury to an assault without serious injury. However, that question need not be answered to resolve the issues in this case.

Cooper has not shown what Warden Keffer was deliberately indifferent to his safety. Warden Keffer apparently made an effort to control the violence at the prison by instituting new policies related to weapons control and inmate movement control, forming a weapons control committee, and educating the staff in weapons detection. If there were not enough walk-through metal detectors at USP-Pollock, that is not attributable to Warden Keffer, but to the BOP. Defendants have emphasized the fact that they were operating USP-Pollock under budget constraints. Warden Keffer cannot be held liable for those constraints.

Because Cooper has not alleged any facts or adduced any evidence to show that Warden Keffer either actually intended to do harm to him, or took an action which was so likely to produce injury that the harm could be characterized as substantially certain to result, Warden Keffer is entitled to qualified immunity.  Therefore, Warden Keffer's motion for summary judgment should be granted.

2. <u>Marques</u>

Cooper argues that Marques: (1) failed to take sufficient disciplinary action against Jeffs (and other inmates accused of assaults and weapons possession); (2) failed to transfer or prosecute Jeffs; (3) failed to refer Jeffs to the U.S. Attorney for prosecution; (4) failed to confine Jeffs in the SHU; and (5) did not ensure there were enough metal detectors and other ways to control weapons in USP-Pollock (Doc. 13).

Marques was not a DHO so he did not have the authority to hear Jeffs' case, transfer Jeffs, sanction Jeffs, or refer Jeffs for prosecution.  Because Cooper has not alleged any facts or adduced any evidence to show that Marques either actually intended to harm him or took an action which was so likely to produce injury that the harm could be characterized as substantially certain to result, Marques is entitled to qualified immunity.  Marques' motion for summary judgment should be granted.

3. <u>Garrow</u>

Garrow was not a DHO and did not have the authority to hear Jeffs' case, sanction Jeffs to segregation, or refer Jeffs for prosecution.  Because Cooper has not alleged any facts or adduced any evidence to show that Garrow either actually intended to harm him, or took an action which was so likely to produce injury that

the harm could be characterized as substantially certain to result, Garrow is entitled to qualified immunity.  Garrow's motion for summary judgment should be granted.

4. Montgomery

Montgomery has shown that he did not have the authority to hear Jeffs' case, sanction Jeffs, or refer him for prosecution, but did refer Jeffs' case to the DHO who could make that decision.  Because Cooper has not alleged any facts or adduced any evidence to show that Montgomery either actually intended to harm him or took an action which was so likely to produce injury that the harm could be characterized as substantially certain to result.  Montgomery is entitled qualified immunity, and his motion for summary judgment should be granted.

5. Zerr

Zerr has shown she did not have the authority to hear Jeffs' case, transfer Jeffs to administrative segregation, or refer Jeffs for prosecution.  Because Cooper has not alleged any facts or adduced any evidence to show that Zerr either actually intended to harm him, or took an action which was so likely to produce injury that the harm could be characterized as substantially certain to result, Zerr is entitled to qualified immunity.  Zerr's motion for summary judgment should be granted.

Conclude

Based on the foregoing discussion, IT IS RECOMMENDED that Defendants' motion for summary judgment (Doc. 100) be GRANTED and that Cooper's action against the U.S. Bureau of Prisons, and Joe Keffer, Anthony Garrow, Ricardo

Marques, Jr., Kenneth Montgomery, and Crystal Zerr (in both their official and individual capacities) be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 2(b), parties aggrieved by this recommendation have **fourteen (14)** days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14)** days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs etc.) may be filed.  Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.  Timely objections will be considered by the district judge before he makes a final ruling.

**Failure to file written objections** to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana on this 3rd day of August 2016.

Joseph H.L. Perez-Montes
United States Magistrate Judge